# Wytheville

RUSSELL HAWKINS V. COMMONWEALTH.

June 15, 1933.

Present, All the Justices.

The opinion states the case.

*L. J. Hammack,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

EPES, J., delivered the opinion of the court.

Russell Hawkins was indicted and tried, upon a plea of not guilty, for the murder of James West. The jury returned a verdict finding him guilty "of voluntary manslaughter as charged in the within indictment," and fixed his punishment at three years in the penitentiary. The accused moved the court to set aside the verdict on the ground that it was contrary to the law and evidence; but

the court overruled this motion and entered judgment sentencing the accused in accordance with the verdict.

The only assignment of error is that the evidence established without contradiction that the accused killed West in self-defense, and for this reason the court erred in not setting aside the verdict.

The accused and West were negroes who lived in the same neighborhood near Gholsonville in Brunswick county, Virginia. The accused was thirty years of age and weighed about 140 pounds. He had lived in that section of Brunswick county all his life. R. B. Cannon, a witness for the accused, testified that he had known the accused all his life; that he had been in his employment for "a good many years"; that his reputation for peace and order was good, and the only thing that can be said against him is that he will drink whiskey at times. On cross-examination this witness admitted that about a week before the killing he did tell the accused that if he did not stop drinking whiskey and keep out of bad company, he would get killed or kill somebody. No witness contradicts this testimony as to the reputation of the accused.

West had come from North Carolina to another part of Brunswick county and had moved into the neighborhood of the accused only a short time before he was killed. He was a short man, weighing between 180 and 190 pounds. Four of the seven witnesses introduced by the Commonwealth (including the sheriff) and R. B. Cannon, all testified that West had the reputation of being a violent and disorderly man. W. S. Cannon, a witness introduced by the Commonwealth, also testified that he had been to Northampton county, North Carolina (from which place West had come to Brunswick county), and had made an inquiry as to West's reputation there; that he had found that he was there regarded as a violent and disorderly man, and had this reputation among his own relatives. This testimony is not controverted by any evidence in the record.

The other evidence of the Commonwealth is as follows: According to the testimony of Bertha Broadnax, on May 25, 1932, she was at the home of the accused visiting his wife, Bessie Hawkins, when about 2 p. m. the accused and West came in together. Both of them were apparently in good humor. The women were in another room and did not have any conversation with the men. The accused and West were drinking, and after a while they "commenced talking loud, and arguing and using bad language and cursing in a violent and angry manner." She does not, however, state what was said by them respectively, or make it plain whether one or both of them were cursing and using violent and angry language. About 3 p. m. she and Bessie Hawkins left the house, and as they were going along a path not far from the house they heard a shot.

Between 3 and 4 p. m. the accused, who "appeared to have been drinking but did not seem to be drunk," came to the house of Harriet Bright, a negro woman who lived about half a mile from his home, and told her that he had killed West and asked her what was the best thing for him to do. He stated to her that West "had treated him dirty, was running over him at his own house and he had killed" him. The accused cried, said to her he was going to give himself up, and left Harriet saying that he was going to get someone to take him to Lawrenceville (the county seat) to the officers.

W. S. Cannon, a white man, got to the accused's house about one hour after West had been killed. He found West lying about six feet from the side porch of the home of the accused, with his head toward the porch. His left arm was under his head. His right arm was stretched out somewhat to one side with an open knife close to his right hand. Soon after Cannon got there, West's wife appeared on the scene and told Cannon that the knife belonged to West.

Charles Turnbull, the sheriff of Brunswick county, was

notified; and he, Mr. E. H. Wesson and Dr. Mallory got
to the house of the accused about 6 p. m. Their testimony
with reference to the position of the body accords with
that of Cannon. The doctor testified that West had died
of a gun-shot wound in the center of his abdomen, an
inch or two from his navel; that the wound was a round
wound about the size of a silver dollar, and that the shot
did not scatter but that all of the shot from the gun had
entered the same wound.

The sheriff went in search of the accused. He found
and arrested him about 7 p. m. on the main highway
from the home of the accused to Lawrenceville, near the
post office at Gholsonville. When the accused was ar-
rested he admitted to the sheriff that he had fired the
shot that killed James West, and stated that he had been
to the residence of a white man, Mr. Buck Wesson, to
get him to carry him to Lawrenceville, that he might give
himself up to the authorities, but failed to find Mr. Wes-
son at home, and he was then making an effort to find
a way to get to Lawrenceville to surrender himself. The
sheriff also testified that the accused "was drunk at the
time of the arrest"; but gives no details as to his condi-
tion at that time, nor does he give his reasons for think-
ing the accused was drunk.

The accused's account of what occurred is this:

About 9 a. m. on May 25, 1932, he was out walking
and passed the residence of West, who called to him and
asked him to come into his house and talk to him. The
accused first said that he was in a hurry, but after a little
went into the house. Soon West produced some whiskey
and asked him to have a drink. He took several drinks
with West and then said that it was time for him to be
going. West said that he would go along with him. The
two left West's house together and walked to the house
of the accused, talking as they went.

When they got to the home of the accused they went
into the kitchen, sat down, and West took two pints of

whiskey from his pocket and placed them on the table. Up to that time the accused had not known that West had any whiskey in his pocket. They continued to drink together, but West drank more than the accused. He did not offer the accused a drink every time he himself took one, but seemed to want to drink most of it himself. After a while they began to argue, and West began to curse and use very boisterous language. When he did this his wife and Bertha Broadnax left the house together, going by the path that led through the woods.

This seemed to make West mad. He inquired as to why the women were leaving, and said to accused: "Your damn wife don't like me and has left home because I am here. I expect to stay here until she returns, and I'll cut her God-damn head off. I'm a bad man anyway, I got away from the penitentiary in North Carolina. I have stayed here in this county long enough, and it is time I was doing something mean and leaving." The accused told West that his wife was not mad, but was leaving because she did not like to hear cursing and bad language. An altercation occurred in which West shoved the accused against the wall and struck him on the ear. West then went out of the house to the wood pile, which was a short distance from the house, and looked among the chips for some little time, as the accused thought, to find an axe with which to kill him. West did not find an axe, but started back towards the house with an open knife in his hand. The accused by this time had come out of the house and was standing on the porch. He went back into the house, got his single barrel shotgun from over the door, again went out on the porch, and with the gun in his hand warned West not to come any further toward him. The warning was repeated several times. West continued to advance; and when he had gotten within about six feet of the porch the accused shot him, believing that West was a dangerous man and intended to attack him with the knife, and that he was in danger

of death or great bodily injury at West's hands. He knew .that West had a bad reputation in the neighborhood for violence and disorder. West had told him that he had cut up a man in the State of North Carolina, and had been sentenced to the State penitentiary, from which he had run away.

After the killing he went to the home of Harriet Bright, told her of the killing, and asked her what to do. She told him to do the best thing for himself, and he decided to surrender to the officers, feeling that the killing was justifiable. He went from Harriet Bright's to the store of Mr. G. W. Wesson (Buck Wesson) to get him to take him to Lawrenceville to give himself up. He did not find Mr. Wesson at home, and remained near Mr. Wesson's store on the public highway until the officers of the law came up and arrested him. When he was arrested he told the officers that he was there waiting to find a way to get to Lawrenceville to give himself up.

The accused further testified that, "I could not say that I was drunk when I shot the deceased, but had taken a number of drinks that day with the deceased while they were together." On cross-examination he stated that when West came toward the house with the knife in his hand, he could have gone into the house and shut the door before West could get to him and thus have gotten out of his way; but that he did not do so because there was no lock on the door.

██ If the testimony of the accused was true, this was a case of justifiable homicide. The fact that a man has been drinking does not *ipso facto* deprive him of the right of self-defense, even though the necessity for the exercise of the right might not have arisen had neither he nor his aggressor been drinking.

██ There is no evidence in the record which tends to contradict the testimony of the accused. His account of what occurred is not inconsistent with any other evidence introduced either by the Commonwealth or the ac-

cused. On the contrary, the evidence of the Commonwealth tends to support the story told by the accused. As was said by this court in *Spratley* v. *Com.*, 154 Va. 854, 864, 152 S. E. 362, 365: "While the jury is the judge of both the weight of the testimony and the credibility of witnesses, it may not arbitrarily or without any justification therefor give no weight to material evidence, which is uncontradicted and is not inconsistent with any other evidence in the case, or refuse to credit the uncontradicted testimony of a witness, even though he be the accused, whose credibility has not been impeached, and whose testimony is not either in and of itself, or when viewed in the light of all the other evidence in the case, unreasonable or improbable, and is not inconsistent with any fact or circumstance to which there is testimony or of which there is evidence. There must be something to justify the jury in not crediting and in disregarding the testimony of the accused other than the mere fact that he is the accused, or one of them."

The judgment of the trial court will be reversed; and as the case of the Commonwealth seems to have been fully developed on the trial which is here under review, the case will be remanded with directions to the trial court to dismiss the case unless it shall be advised by the Commonwealth's attorney that he has other evidence to present upon a retrial of the cause which should, if believed, lead to a conclusion different from that at which we have arrived.

*Reversed.*