# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢

J. W. NELSON, JR. v. COMMONWEALTH OF VIRGINIA.

June 10, 1937.

Present, All the Justices.

The opinion states the case.

*Gilbert L. Diggs,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Special Assistant,* for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

The accused, J. W. Nelson, Jr., was indicted for the murder of his father, J. W. Nelson, Sr., and was convicted of voluntary manslaughter. The legal question presented is whether the evidence is sufficient to sustain the verdict. This question was raised in the trial court by motion to strike the evidence, and by motion to set aside the verdict. These motions were overruled, and timely exceptions noted.

J. W. Nelson, Sr., his wife, and one son, J. W. Nelson, Jr., lived together in a country home. About 10:00 a. m. on Sunday morning December 8, 1935, J. W. Nelson, Sr., and his wife, drove, in their car, about two miles to the home of the parents of the deceased. There Mrs. Nelson bathed and dressed her husband's mother, who is an invalid. Shortly thereafter she drove the car to her own home, leaving her husband and Harry Nelson, a brother, at the home of her husband's parents. Upon the arrival of Mrs. Nelson at her home, her son, the accused, took the car, and with some friends went to a neighbor's, for the purpose of shooting rats. He returned about 2:00 p. m. His account of the tragedy follows:

"Well, I came home from town to Tommy Smith's and went in the kitchen and sat down. I may not have gone there

immediately, but I had a 22 rifle and a 45 calibre revolver with me, I picked up when I went to Freeman's and carried with me. I left the automatic at the car at Smith's and carried the rifle, decided not to carry it. I came home and put that on the ice-box in the kitchen, laid it on the ice-box and set the rifle in the corner. I did not go upstairs, where I usually kept those things, but left them there. I was sitting in the kitchen, and mother came in, and I asked her to fix my lunch. She started to fix my lunch. In the meantime, my father and Mr. Harry Nelson came in, my uncle. When they got out of the car the kitchen door was open, and I heard my father saying something, but I could tell he had been drinking. Usually when he had been drinking he was very disagreeable, and we have been afraid of things he would do, and never left things around for him to get. I picked up some paper and laid it on the gun and went back and sat in the chair. They came in, passed on by and went in the house to look at some puppies we had in there, carried in out of the cold. They stayed in there a few minutes. I was sitting reading a book near the stove, and they came back and came in the kitchen. Mr. Harry Nelson stopped to talk a few minutes going to the porch, and he left. Immediately after he left Mother started to fix the lunch again, and father said, 'Come on, go with me to feed the chickens.' Mother said, 'All right, I will, as soon as I fix Wes's lunch.' He said, 'No, come on go now. Let the little son-of-a-bitch starve.' I never said anything. I heard that so many times, nothing I could do about it. I sat in the chair and pretended to read. He said a few more things. Then, he caught me by the hair with his left hand and pulled me out of the chair, and he hit me on top of the head and I fell back on the arms of the chair. Then I stood up, and I was close to him and he could not hit me so hard, but was hitting as hard as he could. He had me by the arm. Mother came over and I asked him, 'Captain, what have I done to you? Behave yourself. I haven't done anything to you. Why do you have to act like this?' Mother came over and took him by the arm, and in the meantime he told me he was going to kill me—'God damn you, I am going to kill you!

You have got to leave this place!' and repeated it several times. Mother came over and took him by the arm and came between us. He grabbed her in the throat. I stood and looked a minute. I thought he would turn her loose, and told him, 'Captain, don't do that,' and I walked over to the ice-box and picked up the gun and said to him, 'Captain, turn her loose,' and I held the gun up so he would see it. I surely expected when he saw me with the gun, I had the gun up this way over my left shoulder, he would turn her loose and turn to me. I was so sure he would turn her loose when he saw the gun and turn at me and I could keep out of his way until I could get someone to help me. I knew he was killing her, because her face was purplish red. I knew I didn't have any time to lose, and when he didn't turn her loose, I shot him."

The accused in response to questions, stated that his mother and father were standing erect in the center of the room facing each other; that his father had both hands grasping his mother's throat; that he (the accused) was back of his mother, with one hand resting on her shoulder, and the pistol in the other; that the butt of the pistol was almost touching his mother's shoulder, and the end of the barrel was within two feet of his father's face at the moment he pulled the trigger. The bullet entered the right nostril, ranged slightly upward, and lodged in the back of the brain. Death was instantaneous.

It seems that the study of firearms was a hobby with the accused. He was familiar with different types of guns, and experienced in their use. He stated that he knew that the shot fired by him would kill his father. Mrs. Nelson was the only other eye-witness to the killing. Her testimony corroborates that of her son. The other witnesses, one a brother of Mrs. Nelson and the other her nephew, who as undertakers took charge of the body, stated that they detected the odor of alcohol in the blood of the deceased. At the request of the accused peace officers of the county were notified, and within a short time, they, with other neighbors, arrived at the Nelson home. On the same afternoon between four and five p. m., a coroner's inquest was held.

The accused contends that inasmuch as the Commonwealth failed to introduce any evidence that contradicts the account of the killing as related by him and his mother, he has established, as a matter of law, a complete case of self-defense, or rather the necessity to kill in order to save his mother from death or serious bodily harm. In support of this contention he relies upon the following cases: *Richardson* v. *Commonwealth*, 128 Va. 691, 104 S. E. 788; *Spratley* v. *Commonwealth*, 154 Va. 854, 152 S. E. 362; *Hawkins* v. *Commonwealth*, 160 Va. 935, 169 S. E. 558.

The principle recognized and applied in these cases is well stated by Justice Epes in the *Spratley Case*, 154 Va. 854, 864, 152 S. E. 362, 365, as follows: "While the jury is the judge of both the weight of the testimony and the credibility of witnesses, it may not arbitrarily or without any justification therefor give no weight to material evidence, which is uncontradicted and is not inconsistent with any other evidence in the case, or refuse to credit the uncontradicted testimony of a witness, even though he be the accused, whose credibility has not been impeached, and whose testimony is not either in and of itself, or when viewed in the light of all the other evidence in the case, unreasonable or improbable, and is not inconsistent with any fact or circumstances to which there is testimony or of which there is evidence. There must be something to justify the jury in not crediting and in disregarding the testimony of the accused other than the mere fact that he is the accused, or one of them."

The above quotation is simply a statement of the facts and circumstances under which the court should refuse to sustain a verdict of guilty. The record in this case shows the necessity upon which the accused relied to make out a case of justifiable or excusable homicide, was based upon two facts; (1) that the deceased came home insanely intoxicated; (2) and while in that condition he seized his wife and was choking her to such an extent that she became purple in the face, and almost suffocated.

Two witnesses for the Commonwealth, W. B. Nelson and Harry Nelson, father and brother of the deceased, testified

that the deceased was in their presence continuously from 10:00 a. m., the time he and his wife arrived at the W. B. Nelson home, until about 2:30 p. m., the time he left for his own home, except for a few minutes when the deceased left the dining room, where they were eating dinner, to take a tray to his invalid mother in another room in the same building, and that during this interval the deceased did not take a drink of any intoxicant. Harry Nelson testified that he took the deceased from the home of his father to the home of the deceased at about 2:30 p. m., and remained there with the deceased some 15 minutes, and that neither during the drive, nor after he arrived, did he or the deceased drink anything. The shooting occurred within a very few minutes after Harry Nelson left the home of J. W. Nelson. No one claims the deceased drank anything after Harry Nelson left.

Several witnesses for the accused testified that when they arrived at the scene of the tragedy they noticed marks resembling finger prints on the neck of Mrs. Nelson. Other witnesses for the accused stated that while Mrs. Nelson's hair was disheveled and her face and neck red, they did not observe any scratches, bruises, or marks on her neck indicating that any attempt had been made to choke her. The two doctors who testified in the case, one for the accused and the other for the Commonwealth, stated that a bruise might not be observed within a few hours after Mrs. Nelson had been choked, but that after that time bruises or black marks showing the breaking of a blood vessel would be observed for several days. Mrs. Nelson was present the Thursday following the killing at the preliminary examination of the accused. The sheriff and others present on this occasion testified that they did not observe any bruises on her neck.

The testimony concerning the physical condition of Mrs. Nelson's neck, immediately after the shooting and later, was in conflict. Hence the jury had a right to conclude it did not indicate she had been choked, certainly not to the extent claimed by her and the accused.

Sheriff Diggs testified that on the afternoon of December 8th, as soon as he was notified of the tragedy, he went to the

Nelson home, and there the accused voluntarily said: "He (the accused) held his hand up in this way, with the revolver in it, and said, 'Captain, turn her loose,' and repeated it, and he said when he turned her loose he lowered the gun and pulled the trigger. If my memory serves me right, he said, 'When he swung for me, I lowered the gun and pulled the trigger.'

\* \* \* \* \* \* \* \*

"He didn't say he released her entirely, but he said he 'Swung for me' and 'I lowered my gun and pulled the trigger.' "

According to the testimony of the accused and his mother, the deceased was dangerous only when drunk; that at the time of the shooting he was insanely drunk; that he cursed and abused the son, and made an unprovoked assault upon him, to which he offered no resistance. Just as soon as the mother stepped in between father and son, the father turned the son loose and grabbed her. The son looked at his father grasping his mother for a minute or more, then requested him to release her. When his father failed to heed the request, the son walked from the center of the room (the dimensions are not stated in the record) to the ice box in the corner, picked up a 45 automatic pistol, and returned to the center of the room at a point just back of his mother. There he coolly held the pistol in the air so his father could see it, and while so doing, once or twice requested his father to release his mother. When his father failed to heed these requests, the son deliberately pointed the pistol at his father, who was within two feet of the end of the barrel, and fired the fatal shot.

Immediately after the accused had examined his father's body and found that he was dead, he telephoned his mother's brother, who lived within 250 yards of the Nelson home. While the telephone operator was making the phone connection, she heard Mrs. Nelson exclaim "Oh my God! Oh my God! Wesley, why did you do it?" To which the accused replied: "Mother I couldn't help it." While under the circumstances the probative value of this evidence, which was

denied by the accused and his mother, may not be great, the jury had a right to consider it, together with the other evidence in the case, to determine whether or not the accused used more drastic measures than were reasonably necessary to protect his mother from death or serious bodily injury. According to the evidence for the accused, several minutes elapsed between the time the father grabbed the mother, and the time of the fatal shot. During this interval, the accused, an able bodied young man, was entirely free from any interference by his father, and as he relates the incidents he was rather cool and deliberate in his thoughts and actions. The jury evidently concluded that while the accused had reasonable provocation for an attack upon the father, his act, in shooting with a 45 automatic pistol, was more drastic than the attack upon the mother reasonably warranted.

When the Commonwealth has proven the commission of a homicide, and pointed out the accused as the guilty agent, without additional evidence, murder in the second degree is presumed. In order to elevate the crime to murder in the first degree it is incumbent on the Commonwealth to go further and establish beyond a reasonable doubt that the killing was willful, deliberate and premeditated, unless the homicide was committed by one of the specific ways which, by statute, is made murder in the first degree. The burden is upon the accused to overcome, by competent evidence, the presumption of murder arising from the fact of the killing, and to demonstrate by a preponderance of the evidence that the killing was done under circumstances indicating that the grade of the offense was no higher than manslaughter, or that the killing was justifiable or excusable. The court gave instructions embracing these elementary principles, and gave all the instructions requested by the accused on reasonable doubt.

The essence of the contention of the accused is that the jury wrongfully rejected his version of the homicide. This same contention was made in *Maxwell* v. *Commonwealth*, 167 Va. 490, 187 S. E. 506, 510. In that case it appeared that a father was killed in the presence of other members of the

family, and in his own home, by his daughter Edith Maxwell. All persons who saw the killing and who were introduced as witnesses, testified for the accused. These witnesses stated that the father came home drunk and made an unprovoked assault upon the daughter, and that she killed her father to prevent his killing her, or doing her serious bodily harm. The evidence for the Commonwealth tended to show that the deceased was not drunk on the night in question, and that the accused had made a number of contradictory statements as to the reason for the killing and the manner in which it was done. On this point Justice Eggleston speaking for the court said: "True it is the jury has declined to accept the story of the accused and her witnesses that the killing was in self-defense. This they had the right to do. While their story was not controverted by any direct testimony, yet there was evidence of circumstances affecting the credibility of the witnesses themselves and casting a doubt on the probability of their account of the killing. All of these made the defense of justifiable homicide, as detailed by the accused and her witnesses, a question for the jury * * *."

The record in the case now under consideration reveals that the jury might with reason have found: (1) That the deceased was not drunk when he came home on the day of the killing; (2) That Mrs. Nelson was not choked as severely as she and her son testified she had been; (3) That the account of the killing testified to by the accused, when a witness in his own defense, was not altogether in accord with statements made by him immediately after he had shot his father; (4) That even if his evidence be accepted as true, he used more drastic measures than were reasonably necessary to protect his mother from bodily harm.

██ An able trial judge observed the witnesses on the stand and heard their testimony, after which he affirmed the verdict of the jury. Viewing the entire evidence, as we must, we cannot say as a matter of law that the accused is entitled to an acquittal.

The judgment of the trial court is affirmed.

*Affirmed.*