# Richmond

W. G. Saunders and William Smith v. Mary H. Hall, Adm'x, Etc.

November 25, 1940.

Record No. 2256.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Charles B. Godwin, Jr.,* and *Leigh D. Williams,* for the plaintiffs in error.

*Aubrey R. Bowles, Jr., H. Armistead Boyd* and *Tom E. Gilman,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

Mary H. Hall, administratrix of Erwin Nolan Hall, who was her late husband, instituted her action at law by notice of motion for judgment against W. G. Saunders, owner, and William Smith, driver of a certain lumber truck, for the wrongful death of her husband. Later it was discovered that William Smith was not the driver but a passenger on the lumber truck and that one Elmer Hall was the driver. The notice was thereupon amended substituting Elmer Hall as the driver in the place of William Smith.

William Smith, who was injured as a result of the collision between the lumber truck upon which he was riding and the oil truck which the plaintiff's decedent was driving, filed a cross-claim against the administratrix for compensation for his injuries. W. G. Saunders also filed a cross-claim against the administratrix for the property damage to his lumber truck.

The case, including the respective cross-claims of Smith and Saunders, was submitted to the jury under voluminous instructions, and the jury found a verdict in favor of the administratrix against W. G. Saunders for $10,000, upon which the court entered judgment in her favor. Later the court entered judgment *nunc pro tunc* against Smith and Saunders upon their cross-claims.

◼ Objection is now made that the cross-claims have never been passed upon and decided by the jury and that the *nunc pro tunc* judgment was not proper. The cross-claimants made no such objection to the verdict when rendered. They did not claim at that time that the jury failed specifically to mention and pass upon their cross-claims. In fact they agreed to the form of the verdict. Evidence had been introduced before the jury by the cross-claimants tending to support their cross-claims. Their claims were submitted to the jury under instructions that were granted by the court at the request of both the plaintiff and the defendants. Under these circumstances the effect of the verdict in favor of the administratrix was to establish the fact that Erwin Nolan Hall, the driver of the oil truck, was free from negligence. This being true the finding of the jury was bound to have been against the cross-claimants. *Otey* v. *Blessing,* 170 Va. 542, 197 S. E. 409.

◼ The evidence was in serious conflict. The account of the collision, as related by the witnesses for the defendants, was rejected by the jury. The testimony of the plaintiff's witnesses was accepted. The main question now to be determined is whether the plaintiff produced sufficient competent and credible evidence upon which the jury were warranted in finding in her favor. Evidence tending to sup-

port the verdict, in our review of the case, must be considered and analyzed in a light favorable to the plaintiff, and if it is sufficient, then all other adverse evidence may be discarded.

In the petition of the plaintiffs-in-error the statement of facts is taken almost entirely from the evidence introduced by them, just as though they had obtained a favorable verdict in the court below. They scarcely mention the evidence upon which the jury obviously found its verdict.

The administratrix founded her case upon charges of numerous acts of negligence. She charged the defendant Saunders (among other acts of negligence) with equipping and maintaining the lumber truck with faulty, insufficient, and inadequate brakes, improperly adjusted and improperly and negligently applied by the driver. The driver was charged with negligent operation, failure to keep the truck under proper control, failure to keep a lookout, failure to drive on the proper side of the highway, and failure to yield one-half of the highway to approaching vehicles.

The highway was straight, the hard surface sixteen feet wide, and there were dirt shoulders on each side of the hard surface. The highway ran in an easterly and westerly direction and was known as the King's Highway. Some thirty-five to forty feet west of the point of the collision is an intersection of Main street at right angles on the south side of the highway. Main street does not cross the highway. It is from forty to forty-five feet in width and runs south from the south side of the King's Highway. The collision occurred at approximately 1:30 o'clock in the afternoon. A "drizzling" rain and a slick roadway added to the perils of the traveler on that day.

What is known as the lumber truck was an improvised trailer and tractor. It had been used to haul cross-ties to a creosoting plant in Portsmouth and was being driven on a return trip after unloading the ties. It was empty and was being driven on its right side of the road in a westerly direction.

The oil truck, which was being driven by the decedent in an easterly direction and on its proper side of the highway, was meeting the lumber truck. Witness Taylor, introduced by the plaintiff, described the collision and what took place immediately prior thereto as follows:

"I was walking down the King's Highway. I had been held up at the D. P. store on account of a downpour of rain, and it had slowed up, and it was drizzling, and I was on the south side of the King's Highway going west. As I got within fifty or seventy-five yards, more or less, of my home, I saw an oil truck approaching me, also on the south side of the King's Highway. I heard a *flashing* of a motor behind me and I looked back over my right shoulder, which would be on the north side of the King's Highway; I saw a log truck coming along, the lumber truck. Just at the same time I saw a green sedan pull out from behind it and begin *to race* (italics supplied) down the road to get by. *They raced* (it. supp.) down the road until they had reached where I was then and began to pass; about that time this green sedan was going at such a rapid rate of speed it had gotten too close to this oil truck, which was approaching from the west, going east, and he going west. He couldn't get in front of that oil truck so he went by that oil truck on the south side at Main street. When he went by I saw the driver of the oil truck make a little turn northwardly and continue on. I looked back and I saw this lumber truck had put on brakes, apparently had, and the wheels wasn't turning no more. It then began to go in a kind of sliding form and gradually creeping across the road to the south. Just about that time I heard a *a* distressing cry and the crash. I had to jump the ditch, and when I jumped in the ditch they piled up on the south side of the road in the ditch.

"Q. Now, the south side of the road would be the oil truck's right side of the road; is that correct?

"A. Yes, sir."

As a result of the collision the plaintiff's decedent was almost instantly killed.

Taylor further testified that the driver of the oil truck turned to the left some eighteen inches over the center line of the highway but that the collision occurred on the south side or on the side where the oil truck properly belonged. He described the position of the oil truck after the collision and said that the tractor part of the oil truck was entirely off the hard surface on the south side. The two right wheels of the trailer were also off the hard surface on the south side.

Taylor is substantially corroborated regarding the position of the oil truck after the collision by the testimony of Officer Williams who arrived on the scene before the trucks had been moved. Williams made a pencil diagram which was introduced as defendant's exhibit "E." According to this diagram, the oil truck was entirely upon its side of the highway. The lumber truck was on its left side of the road and was struck just behind the cab on the right side by the front of the oil truck. The rear of the trailer of the lumber truck extended beyond the center of the hard surface and its tractor was beyond the south side of the hard surface and partly on the south shoulder and in the ditch on the south side.

The driver of the lumber truck said that he "slapped on" his brakes, and Taylor said that when the brakes were applied the lumber truck started to skid to its left and continued to skid until the collision occurred.

Taylor also said that the wheels of the lumber truck were locked when the brakes were applied; that it began skidding and skidded across the road to the south side and in front of the oncoming oil truck. The oil truck at no time obstructed the lumber truck's side of the road. Had the driver of the lumber truck continued on his side the collision would not have occurred.

The driver of the lumber truck described the brakes on his tractor and trailer. He said the tractor was equipped with ordinary Ford mechanical brakes. The trailer was equipped with air-operated vacuum brakes which were applied by turning a lever on the dashboard. The trailer

brakes as well as the tractor brakes were controlled by a foot brake pedal. The air brakes were in operation on the trailer which, as we have seen, was unloaded at the time. The brakes on the tractor and trailer were so adjusted that they became effective at the same time, with equal retarding power and tension. The adjustment of the brakes remained the same whether the trailer was loaded or empty.

An expert brake mechanic was introduced and he testified that the adjustment of the brakes described by the driver of the lumber truck was not proper. He said that with such adjustment the application of brakes on a wet road would cause such a tractor and trailer as the lumber truck to get out of line and "jack-knife" to one side of the road and if it should happen to get out of line and start to the left the whole truck would "jack-knife" and skid across the road to the left side.

The expert also testified that safety demanded that there should be a difference in adjustment of brakes on a tractor-trailer type when the trailer is loaded and when it is not loaded. Greatest braking power must be placed where there is the greatest weight and the greatest traction. He said that if the brakes are adjusted on a trailer for a load and it is not loaded (the exact situation in regard to the trailer involved in this case) a "jack-knifing" accident will likely occur when the brakes are applied because of the lack of traction on the wheels of the empty trailer.

From the evidence introduced by the plaintiff touching the braking equipment, its adjustment, and the application of the brakes at the time, the court was warranted in submitting to the jury the question of whether the defendants were negligent in respect to these things.

It is argued that the sole proximate cause of the collision was the negligence of the driver of the green sedan in attempting to pass the lumber truck when there was not sufficient distance between the lumber truck and the oil truck for it to pass. It is also argued that the passing of the green sedan brought about an emergency that would be effective to relieve the driver of the lumber truck from exer-

cising the care and prudence that one would be expected to exercise under normal conditions.

The court in instruction 3-A, granted on behalf of the defendants, instructed the jury that if the negligent conduct of the driver of the green sedan was solely responsible for the collision there could be no recovery against the defendants. The court also instructed the jury in instruction 4, granted at the request of the defendants, that if a person is confronted with a sudden emergency he is not required to make a wise choice; that if the driver of the green sedan and the driver of the oil truck "presented to him (the driver of the lumber truck) a sudden emergency created without his fault, either to hold his course or turn to his right or to his left in order to avoid a collision, and that he cut to his left in an effort to avoid the accident, and that his action in so doing was such as a person of ordinary prudence might have done under like circumstances, then he was not guilty of negligence even though he failed to avoid the collision and even though you believe he could have avoided the accident had he stayed on his side of the road."

██ Thus it is seen that the court submitted these issues to the jury. We think they were for the determination of the jury.

The emergency rule is well known, but its application at times is difficult. Generally whether one is without fault in bringing about an emergency is for the jury. It is seldom for the determination of the court. Here the question is whether all of the evidence, as a matter of law, disclosed that the driver of the lumber truck was placed in a sudden emergency through no fault of his own, or whether there was evidence which tended to show that he brought about or assisted in bringing about the emergency by his own conduct.

The jury could have found from the evidence that the brakes were improperly adjusted; that they were "slapped on" or improperly applied on the wet surface by the driver of the lumber truck; that he should have sooner discovered the green sedan in the exercise of a proper lookout and per-

mitted it to pass in safety, and that he "raced" the green sedan and failed to remain on his side of the road.

■ Whether the driver of the lumber truck was with or without fault in bringing about the emergency under the evidence was for the jury.

Error was assigned to the ruling of the court in excluding from the evidence a written statement purporting to have been signed by William Andrew Taylor, a witness for the plaintiff, in which he estimated that the oil truck was being driven at from thirty-five to forty miles per hour and the lumber truck at thirty to thirty-five miles per hour immediately prior to the collision. When Taylor was on the stand testifying as a witness for the plaintiff he estimated the speed of the oil truck at twenty-five to thirty miles per hour but stated he could not estimate the speed of the lumber truck.

■ Under the first part of Code, section 6216, a prior inconsistent statement of a witness is admissible to impeach him if the terms of the statute are met. However, under the last portion of the statute a prior written statement of a witness may not be used to contradict the witness where the action is one to recover for a personal injury or to recover for death by wrongful act or neglect unless it be in the form of a deposition taken after due notice.

■ Insofar as the action of the administratrix against Saunders is concerned, the statement was clearly inadmissible because this was an action for wrongful death and the statement was not a deposition taken after notice. The statute would not permit its introduction. It is claimed, however, that the cross-claim of Saunders against the administratrix was not an action for personal injury or wrongful death and therefore, insofar as this cross-claim was concerned, the statement was admissible under the first part of section 6216. That portion of the statute reads as follows: "A witness may be cross-examined as to previous statements made by him in writing or reduced into writing, relative to the subject matter of the proceeding, without such writing being shown to him; but if it is intended to

contradict such witness by the writing his attention must, before such contradictory proof can be given, be called to the particular occasion on which the writing is supposed to have been made, and he may be asked if he did not make a writing of the purport of the one to be offered to contradict him, and if he denies making it, or does not admit its execution, it shall then be shown to him, and if he admits its genuineness, he shall be allowed to make his own explanation of it; but it shall be competent for the court at any time during the trial to require the production of the writing for its inspection, and the court may thereupon make such use of it for the purpose of the trial as it may think best."

A brief consideration of the statute discloses that certain things must be done by the party offering the statement as a condition precedent to its introduction. The witness must first have his attention called to the particular occasion on which the written statement is supposed to have been made. He may be asked if he did not make a statement and, if he denies it, he shall be shown the paper. If he admits he made it, he shall be allowed to explain it. In other words, the statute is intended to permit the statement only after a proper foundation is laid. In the present case none of the preliminary requirements of the statute were complied with and therefore the statement was properly excluded as to Saunders.

In addition to the foregoing, the record fails to show that the proper exception and the grounds for the exception were preserved in accordance with Rule 22.

The plaintiffs-in-error attack the credibility of witness Taylor. They say that when he fixes certain distances in yards and feet and then fixes his own position by a certain number of feet from a certain point, it is mathematically certain either that he was not where he said he was or that the collision did not occur where he said it occurred. This is given as a reason for disregarding Taylor's testimony. In the very nature of things an estimate of distances

in feet and yards is not intended to be accurate. It, at best, is an approximation involving estimates, best judgment, and opinion. Estimates of distances naturally will vary and witnesses will differ. This kind of evidence is peculiarly for a jury. If a witness has given incorrect estimates of distances where events are happening quickly, this is a matter to be considered by the jury in weighing his testimony. It is not ground for holding that his entire testimony is incredible, unworthy of belief, and as a matter of law to be excluded.

Eighty-five pages of the record are consumed with the instructions, objections, rulings of the court, colloquies, and exceptions. The trial judge manifested an unusual degree of patience in hearing counsel. He ruled with promptness and ability on the many points raised. Many hours were consumed in hearing counsel on the instructions. Instructions touching every phase of the case were given the jury. Nearly every instruction offered was the subject of one or more objections. Many of the instructions given and many not given are now the subject of assignments of error. In the trial of a case such as this it would not be humanly possible for a trial judge to try the case without committing error. We have, however, considered each and every assignment of error and are firmly convinced that upon the whole case no reversible error appears. The judgments are accordingly affirmed.

*Affirmed.*

HOLT, J., dissenting.

This accident occurred about 1:00 P. M. July 27, 1937, upon a paved concrete road about 16 feet wide. It had been raining and was still drizzling. Traveling west on its right-hand side was a Ford truck and trailer, 1936 Model, hereafter referred to as the lumber truck; following it was a passenger car, a sedan; going east, and on its right-hand side, was an oil truck. As these vehicles approached each

other, the sedan undertook to pass ahead and turned to its left. At that time the oil truck was so near at hand that the sedan driver was forced to turn still further to his left and passed the oil truck about where Main street joins the highway. The oil truck and the lumber truck collided. Plaintiff's decedent, E. R. Hall, driving the oil truck, was killed. Elmer Hall drove the lumber truck and with him went his friend, William Smith. Smith, Elmer Hall and William Taylor are the only witnesses testifying who have first-hand knowledge of conditions obtaining when Hall was killed.

Elmer Hall was introduced as a witness by the plaintiff, who asked that he be treated and examined as an adverse witness. To that, objection was made, and the court said:

"Well, proceed along the lines of normal expectancy until it develops he is adverse; then you can cross-examine him. I do not see why you should not proceed with the ordinary line of questioning of the witness."

No such conditions afterwards developed during the plaintiff's examination.

Elmer Hall was then recalled by the defendant. He said that he drove the lumber truck for W. G. Saunders; that it was a Ford truck and trailer, 1936 Model, and was then lightly loaded with lumber. Just before the accident he was driving on his right side of the road, which was straight, paved with concrete and about 16 feet wide. It was then drizzling and the road was slick. He saw the oncoming oil truck, coming pretty fast, though he does not undertake to say how fast. He was followed by a passenger car, a sedan. It undertook to pass him on his left but gave no passing signal, and he did not see it at all until it was even with the cab of the truck. The sedan then faced the oil truck and to avoid a collision turned still further to the left and passed the oil truck to its right, went on and has not since been seen. The oil truck, to avoid a collision with the sedan, turned to its left, which brought it in front of the lumber truck and made a head-on collision imminent. He was asked:

"Q. Elmer, at the time that you saw this truck and this passenger car facing each other, did you do anything besides turn to the left?

"A. Yes, sir. I slapped on the brakes one time, and then I saw the oil truck turn out in front of me; I throwed this truck in second gear and tried to get out of the way of it."

At that time the oil truck turned to the right, back into what would have been its normal line of travel. He said that had the oil truck not done this, it could have passed to the rear of his truck on the north side of the road. The reason he gives for not turning to the right was that it would have taken him off the paved surface and into a grass-covered ditch. The oil truck struck the lumber truck just behind its cab.

William Taylor, a colored man, lived on the corner of Main street and this highway and was walking on its south side towards and near his home. He tells us at some length what he saw:

"A. Well, right at that particular time I judge—I didn't make a good survey or anything, but I think I was about fifty yards at that time.

"Q. Now, tell the jury just what you saw.

"A. I was walking down the King's Highway. I had been held up at the D. P. store on account of a downpour of rain, and it had slowed up, and it was drizzling, and I was on the south side of the King's Highway going west. As I got within fifty or seventy-five yards, more or less, of my home, I saw an oil truck approaching me, also on the south side of the King's Highway. I heard a *flashing* of a motor behind me and I looked back over my right shoulder, which would be on the north side of the King's Highway; I saw a log truck coming along, the lumber truck. Just at that same time I saw a green sedan pull out from behind it and begin to race down the road to get by. They raced down the road until they had reached where I was then and began to pass; about that time this green sedan was going at such a rapid rate of speed it had gotten too close to this oil truck, which was approaching from the west, going east,

and he going west. He couldn't get in front of that oil truck so he went by that oil truck on the south side at Main street. When he went by I saw the driver of the oil truck made a little turn northwardly and continue on. I looked back and I saw this lumber truck had put on brakes, apparently had, and the wheels wasn't turning no more. It then began to go in a kind of sliding form and gradually creeping across the road to the south. Just about that time I heard a distressing cry and the crash. I had to jump the ditch, and when I jumped in the ditch they piled up on the south side of the road in the ditch."

He looked back and saw the lumber truck coming—"just at that moment I saw the green sedan pull out from behind it. * * * The lumber truck and the green sedan was coming, the motors were roaring as if to get by one another." He was asked what the oil truck did and said: "Well, made a little sharp turn, I would say turn; I said it made a commotion in the statement I once said; they asked what I meant by a commotion, and I said as if to turn out and allow the green sedan to pass it;" and that the oil truck went about 18 inches to the north of the center of the paved highway. The lumber truck put on its brakes and skidded from a point 35 or 40 yards to the east of Main street, which is about 35 feet wide. The oil truck turned to its left at the edge of Main street, probably at its western edge. He was asked about the speed of the oil truck and said: " * * * I can't term speed very well walking and the car traveling, but I did say and I would say around 25 or 30 miles an hour, probably 25 or 30." He also said: "I couldn't term speed from walking and a car approaching."

He was also asked if he knew the speed at which these trucks were traveling and said that he did not.

He was further questioned about the racing of the lumber truck and the sedan and answered: "I said the motors were roaring as if racing; that is what I said," and that the lumber truck and the oil truck were about 75 yards apart when he saw the green car attempting to pass. The sedan did pass the lumber truck and it passed the oil truck to the

south and to its right, where Main street comes into the highway.

William Smith, who, as we have seen, rode with Elmer Hall in the lumber truck, said that they were going from 20 to 25 miles an hour and that the road was slick and that he heard no passing signal from the sedan.

It is true that a jury's verdict settles most conflicts in evidence but the testimony of an unimpeached witness, not contradicted and not inherently improbable, can not be set aside, even though he be an interested party. We held otherwise in *Chesapeake & O. Ry. Co.* v. *Martin,* 154 Va. 1, 143 S. E. 629, 152 S. E. 335 (March 20, 1930). That case was reversed on appeal. *Chesapeake & O. Ry. Co.* v. *Martin,* 283 U. S. 209, 51 S. Ct. 453, 456, 75 L. Ed. 983 (decided April 13, 1931). There the Supreme Court said that the rule "is definitely to the contrary."

In *Spratley* v. *Commonwealth,* 154 Va. 854, 152 S. E. 362, Mr. Justice Epes said:

"While the jury is the judge of both the weight of the testimony and the credibility of witnesses, it may not arbitrarily or without any justification therefor give no weight to material evidence, which is uncontradicted and is not inconsistent with any other evidence in the case, or refuse to credit the uncontradicted testimony of a witness, even though he be the accused, whose credibility has not been impeached, and whose testimony is not either in and of itself, or when viewed in the light of all the other evidence in the case, unreasonable or improbable, and is not inconsistent with any fact or circumstance to which there is testimony or of which there is evidence. There must be something to justify the jury in not crediting and in disregarding the testimony of the accused other than the mere fact that he is the accused, or one of them."

See also, *Nelson* v. *Commonwealth,* 168 Va. 742, 191 S. E. 620.

Moreover, Elmer Hall was summoned by both plaintiff and defendants and was first introduced by the plaintiff. It is true that one is not bound by some statement which his

witness might make, yet he does vouch for his general standing and credibility. No one should ask a court to believe a witness whom he knew to be untruthful. Both Elmer Hall and William Smith said that the lumber truck was traveling from 25 to 30 miles an hour and that, at least, was the speed of the oil truck, because it was going as fast or faster than the lumber truck. When Taylor looked back and saw the green sedan drive out from behind the lumber truck, these trucks were about 75 yards apart and were therefore approaching each other at something like 60 miles an hour. All that happened must have happened in a moment of time. They were about two and one-half seconds apart. When the oil truck driver saw this sedan cut out from behind the lumber truck and that a collision with it seemed imminent, he did what any one instinctively would have done—he made, as Taylor said, "a little sharp turn to the left" and went 18 inches beyond the center of the street. He must have realized that the lumber truck, about seven feet wide, could not then pass him on the pavement. The sedan was then out of the way, and to avoid the approaching lumber truck, he attempted to get back on his side of the road. But the lumber truck driver had seen that the oil truck was ahead of him and that a collision appeared to be inevitable if he kept on; one of two courses was open to him—he might have turned to the right, onto the shoulder and into the ditch, or he might, at speed, have followed the sedan and passed the truck to the south as the sedan did. Had the oil truck not turned to the north but kept on its way, then it might have passed in safety both the sedan and the lumber truck. We may concede that neither of these drivers acted with the utmost good judgment, but there was no time in which to weigh chances—they were confronted with an emergency for which neither was responsible. Both of them, in the moment in which they had to decide, did what seemed to be best in the emergency thus presented.

Reliance is placed upon Taylor's statement to the effect that the lumber truck and the sedan appeared to be racing.

At the risk of repetition, I will restate that part of this witness' testimony relied upon to support this claim.

Taylor's home was at the junction of Main street and the highway. When first seen, the oil truck was west of Main street, the lumber truck east of it, and they were about 75 yards apart. He, himself, was walking west when "I heard a *flashing* of a motor behind me and I looked back over my right shoulder, which would be on the north side of the King's Highway; I saw a log truck coming along, the lumber truck. Just at that time I saw a green sedan pull out from behind it and begin to race down the road to get by. They raced down the road until they had reached where I was then and began to pass; about that time this green sedan was going at such a rapid rate of speed it had gotten too close to the oil truck, which was approaching from the west, going east, and he going west. He couldn't get in front of that oil truck so he went by that oil truck on the south side of Main street." Again he said "the lumber truck and the green sedan was coming, the motors were roaring as if to get by one another." He further said that the crash was about 35 or 40 feet east of Main street and that the lumber truck put on brakes and began to skid 35 or 40 yards from Main street. He also said that he could form no estimate as to the speed at which these racing motor vehicles were traveling.

The oil truck, when first seen 75 yards from the lumber truck, was west of Main street, for the sedan which had gone ahead passed it at that point. The collision occurred 35 or 40 feet east of Main street. That street is 35 feet wide, and while we do not know exactly how far away the oil truck was when first seen, it must have been more than 25 yards away from the point of collision; from which it follows that the lumber truck, when first seen, could not have been more than 50 yards from Main street. It put on brakes 35 or 40 yards from that point, or within 10 or 15 yards from the time that the sedan shot out from behind it.

If there was racing at all, it could in no event have been for more than 10 or 15 yards. Certainly it could not have

"raced down the road until they had reached where I was then and began to pass," for Taylor afterwards said: "Well, he never stopped until the crash, because he was skidding right directly to me, because that is why I jumped in the ditch." One can not be racing and skidding with brakes on at the same time.

This witness, who was near enough to hear these motors roar, heard no passing signal given by the sedan. Elmer Hall and William Smith both say that there was no such signal given. Taylor could not undertake to say how fast the lumber truck was traveling; Hall and Smith say that it was going from 25 to 30 miles an hour, and Hall further states that he knew nothing at all about the sedan until it had passed his trailer and pulled abreast of his seat in the cab.

It is true that we accept the jury's verdict on matters in dispute unless it is "plainly wrong." But there is no conflict of evidence as to the absence of a passing signal or as to when Elmer Hall first knew the sedan intended to pass him. Some distance must have been covered by these vehicles between the time that the sedan pulled out from behind the truck and the time Hall first saw it, and the possible period in which they were racing is, thereby, correspondingly cut down.

Demonstratively the truck could not have been racing the sedan until it knew that there was a sedan. The sedan did pass the truck, and for a moment of time was abreast of it. In such circumstances, it is common knowledge that to one ahead looking back they appear to be racing. It is plain that the sedan and lumber truck were not racing when the oil truck turned to its left. No truck driver in his right mind, meeting these two vehicles abreast racing on this narrow road, would turn from his rightful lane, in which the sedan then was, into the lane of an oncoming truck. That he did turn was because the sedan was close upon him; danger from it was imminent while that from the truck more remote.

But aside from all of this and whether they were racing or not, what actually occurred is reasonably plain. The oil truck driver did not turn out because he saw two cars racing towards him—he turned out to avoid the sedan, which was racing ahead, and made "a little sharp turn" to the left and went beyond the center of the road and into the lumber truck's right of way. When the danger of collision with the sedan had passed, he turned back to the south and into its pathway. When the lumber truck driver saw the sedan in his pathway ahead of him, it turned to the left and put on brakes and skidded, as trucks will do on a wet, slick hard-surfaced roadway. Skidding it was out of control and ran into the oil truck which had at that time come back to its right side of the road, striking it behind the cab driver's seat. The accident was unavoidable in the circumstances,—circumstances brought about by the sedan, whose negligence was the sole proximate cause. The only racing that was done it did.

For these reasons I must dissent.

SPRATLEY, J., concurs in this dissent.