# Richmond

BARNEY PRESLEY V. COMMONWEALTH OF VIRGINIA.

June 10, 1946.

Record No. 3102.

Present, All the Justices.

· The opinion states the case.

*F. H. Combs*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *W. Carrington Thompson, Assistant Attorney General*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

The defendant, Barney Presley, stands charged with murder, and was convicted of second degree murder and sentenced to ten years confinement in the penitentiary. He has applied to this Court for and has been granted a writ of error.

On Sunday, August 5, 1945, he shot and killed Walter Crouse on a public road in Buchanan County. Both of these men are married and both of them have children, and each lived in a mountain section of that county. Crouse worked for a lumber company across the border in Kentucky. Presley was a carpenter of sorts and owned and operated for hire a small or pick-up truck, taking freight as he found it.

In February 1944, Crouse employed Presley to build a house for him, and this contractor finished that work in September following. Since Crouse did not live at home, the arrangement was that Mrs. Crouse would do the buying and pay for it. For these reasons she usually rode with the

defendant. Something like eighteen or twenty trips were made. On most of them they were accompanied by others, sometimes members of her family, sometimes members of his. Once or twice she rode alone with him in the truck's cab. On one occasion they met by chance in the hospital. On another they took dinner together in a hotel with a friend. Once they had pictures taken by the same photographer but not together. Unquestionably they were on friendly terms, but there is not a line of evidence that would indicate improper relations. There was, however, neighborhood gossip, which came to Crouse's ears.

While this work was in progress Presley bought from Crouse's son, who was under age, an automobile. This transaction irritated Crouse who thought Presley had overreached his son in the bargain. He was irritated and so expressed himself, the net result of which was that this trade fell through. Crouse did not pay Presley in full for his work, though he had promised several times to do it. Presley, on his part, was on the lookout for Crouse in order to collect his debt. They met by chance in the public road and this is Presley's account of what then occurred:

"The morning this trouble happened I went up to Mr. Leftwich's, I had been working for him * * * and as I came back down the road from Mr. Leftwich's and was getting out almost to the main road, hardsurfaced road, and there is a stiff curve, bushes not cut off, I expect I was making 15 miles, I was slowing down, because there was a sign there, slow down, I was always very careful, I never had an accident in an automobile in my life, and as I came around there, he (Crouse) was going from the right hand side of the road and run across the road—well, he didn't run, but walked fast, and when he got over on to the left hand side, he throwed his right hand in his pocket and threw his left leg out, and I slowed down and before I stopped, he throwed his hand up and grabbed that little mirror, and went two or three steps before I got stopped.

"Q. 31. Was he drinking?

"A. I really thought he was drunk, he seemed to be very

wrong some way or another, and the first thing he said when he threw his hand on the glass, and stepped two or three steps, as the car came to a stop, he says, 'I want to see you a minute'.

"Q. 32. Did you have your glass down?

"A. Yes, sir, and when I stopped he took his hand down off the glass, and when I stopped, I just placed my hand up at the back of my head that way (indicating) and looked down at him, and I could see the bead on it (his pistol), the way he was holding it, and he says, 'God-damn you, I want to know how much it is I owe you', and I said, 'I don't know, Walt, just how much it is, I have it down, it is about $50.00', and he said, 'God-damn you to hell, I heard you were going to law me', and I says, 'I guess you have', and he said, 'God-damn you to hell, I will just put an end to you right now', and I had my gun lying on the seat beside me, and I grabbed it and brought it up and shot as I went over that way, and I started to pull out, and I thought of his feet and I looked to see where his feet were, and they were about that far (indicating) from the wheel of the truck, and about the time I started to pull out, I saw these boys at the side of the road, I went on down and hollowed to the boys, had to hollow twice before I got them to hear, I didn't see any more men folks, I stopped and halloed at Iv Compton the second time and I said, 'I have shot Walter Crouse up there', and I said, 'Run up there and see if you can do something for him', and I went on home and later we came on down to Grundy to F. W. Smith's' ". * * * "A. He was standing facing me and with his hand on the truck that way, and when he said, "I will put a God-damned end to you', and started to jerk his gun that way, I flashed my eye down and got my gun".

Ira Hale, a deputy sheriff, was among the first to reach the body. This is what he saw: "Well, he was lying there and the gun sticking out here like that and they tied a string through the guard of the gun, I thought it looked like it had been stuck in his pocket, was the reason we did that, thought

we might need finger prints, and we didn't want to hand it around."

Mr. Compton also saw the body. The barrel was in Crouse's pocket, but the handle and cylinder were outside. Crouse was shot three times, once in the neck, once near the left elbow and once on his left side.

John Kean had a country store. Oscar Kean came up to it and told him of the tragedy. About two weeks before that time, Crouse asked Kean if he would go on his bond, in the event that he got into trouble. This is Kean's account of what occurred:

"Yes, sir, he came there and said they had had some words, abusive language and he said, 'He called me off the truck last night and raised a row with me', and he said, 'I talked to him a right smart about my wife', and he expected to have to pay a fine, and he asked me if I would go his bond to keep him from having to go to jail, if they arrested him on it". * * * * "I told him I would but it was too little a thing to bond for, he said, 'He is running around and messing around with my wife', and he says, 'I told him some straight talking', and he said, 'I want to go back to work, don't want to lose work on account of it', and he asked me if I would go his bond."

The deceased had made threats against the accused and on the night before the homicide borrowed a pistol from a fellow workman.

Mrs. Laura Stump said that she heard Crouse tell Presley to keep off the premises and not to have his wife in the car, and that soon after the killing "he told me that he wanted me to swear that Crouse threatened Presley's life, and offered me ten dollars to do this", and that another time he cursed her and said that he would have the law on her, and that there was then present Cliff Leftwich and another man, and that later she saw him take Mrs. Crouse for a ride in an automobile. This other man appears to have been Parrot Presley. This statement both Parrot Presley and Leftwich denied. She said that she saw Presley take Mrs. Crouse for an auto-

mobile ride. If she saw them she must have seen them something like a mile away and across a mountain.

This witness is incredibly ignorant. Her reputation for truthfulness has been so thoroughly discredited that we may disregard any unsupported statement which she has made.

What weight attaches to the testimony of the accused and when?

In *Puckett* v. *Commonwealth*, 157 Va. 800, 160 S. E. 19, it is said:

"In *Chesapeake, etc., Ry. Co.* v. *Martin*, 283 U. S. 209, 51 S. Ct. 453, 456, 75 L. Ed. 983, the court quotes with approval the general rule laid down in *Hull* v. *Littauer*, 162 N. Y. 569, 57 N. E. 102: 'Generally, the credibility of a witness, who is a party to the action and, therefore, interested in its result, is for the jury; but this rule, being founded in reason, is not an absolute and inflexible one. If the evidence is possible of contradiction in the circumstances, if its truthfulness, or accuracy, is open to a reasonable doubt upon the facts of the case, and the interest of the witness furnishes a proper ground for hesitating to accept his statements, it is a necessary and just rule that the jury should pass upon it' ".

"In *Clopton* v. *Commonwealth*, 109 Va. 813, 818, 63 S. E. 1022, 1023, Judge Keith quotes with approval from Proffatt on Jury Trial, section 363. There we read:

"The general rule, that where unimpeached witnesses testify positively to a fact, and are uncontradicted, the jury are not at liberty to discredit their testimony, is subject to exceptions; as, where the statements of the witness are grossly improbable, or he has an interest in the question at issue. However well settled the rule may be that the credibility of a witness is for the jury, the judge has power to instruct them as to what circumstances are to be unfavorably considered in their estimation of his evidence. So the testimony of a witness may be wholly rejected by a jury, if from his manner and the improbability of his story or his self-contradiction in the several parts of his narrative, the jury become convinced that he is not speaking the truth;

and this is true although he be not attacked in his reputation, or contradicted by other witnesses.

"That the above is the accepted rule in Virginia is reaffirmed in *Metropolitan Life Ins. Co.* v. *Botto,* 153 Va. 468, 480, 143 S. E. 625, 154 S. E. 603."

See also, *Spratley* v. *Commonwealth,* 154 Va. 854, 152 S. E. 362; *Hawkins* v. *Commonwealth,* 160 Va. 935, 169 S. E. 558; *Epperson* v. *DeJarnette,* 164 Va. 482, 180 S. E. 412; *Drake* v. *National Bank of Commerce,* 168 Va. 230, 190 S. E. 302, 109 A. L. R. 1517; *Worsham* v. *Commonwealth,* 184 Va. 192, 34 S. E. (2d) 234.

The account which the accused gives of this homicide is not inherently improbable but bears upon its face evidence of intrinsic probability, and is contradicted by no evidence except that of Mrs. Stump, which as we have seen is completely discredited. Not only is it not improbable, but is amply sustained by other testimony. Crouse with an oath had threatened murder to Presley to his face. He was irritated about the sale of the automobile to his son. He had failed to pay for work which Presley did about the building of his house. Presley had threatened to sue him and that angered him too. He was expecting trouble with Presley and made arrangements for bail should the occasion arise and as a reason therefor said to John Kean, to whom he applied, "He is running around, and messing around with my wife", and on a Saturday before he was shot he had armed himself with a pistol, which he had borrowed from a friend. That he was looking for trouble is too plain for argument. He sought it and in the vernacular the other man beat him to the draw.

Of course the principles here invoked must be applied with caution. *Tillman* v. *Commonwealth, ante,* page 46, 37 S. E. (2d) 768, an opinion handed down by Justice Eggleston on April 12, 1946.

> "If self the wavering balance shake,
> It's rarely right adjusted."

■ ■ Presley was not guilty of murder. Malice is its necessary ingredient, expressed or implied.. *DeJarnette* v. *Commonwealth*, 75 Va. 867, 876. All other homicide is manslaughter, sometimes punishable, sometimes not.

For reasons stated the judgment of the trial court is reversed.

*Reversed and remanded.*