DOCK MACK, *alias* BILL MACK, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

CRIMINAL LAW.—EVIDENCE—IDENTIFICATION BY VOICE.

A witness may be permitted to identify an accused solely from having heard his voice, and such testimony is admissible and legitimate to establish identity. Such evidence is not the statement of mere matter of opinion, but is the statement of a conclusion reached directly and primarily from an operation of the sense of hearing. Neither is such evidence to be considered as circumstantial, but is direct and positive proof of a fact, and its probative value is a question for the jury.

This case was decided by Division B.

Writ of Error to the Circuit Court for Duval County.

The facts in the case are stated in the opinion of the court.

*John E. Hartridge,* for plaintiff in error;

*W. H. Ellis,* Attorney General, and *A. G. Hartridge,* State Attorney for the Fourth Judicial Circuit, for the state.

TAYLOR, J.—At the fall term, 1906, of the circuit court in and for Duval county the plaintiff in error, a negro, hereinafter called the defendant, was indicted for the crime of rape, his victim being a white girl. In March, 1907, he was tried, convicted and sentenced to die, and comes here for review of such judgment by writ of error returnable to the present term. The only error assigned or presented here is that the court below erred in denying the defendant's motion for new trial made upon the grounds that the verdict was not. supported by the evidence, that the evidence was not sufficient to support the verdict, and that the verdict was in violation of the principles of law involved in the case.

The material facts proved by the state were substantially as follows: Miss B., the victim of the crime, an unmarried white woman twenty-two years of age had for about eleven years resided with her mother on the outer edge of the suburbs of the city of Jacksonville in a dwelling located on what is called Enterprise street in a sparsely settled neighborhood. An electric street car line runs from the city of Jacksonville along said Enterprise street, terminating at its intersection with what is called Myrtle avenue that crosses said Enterprise street practically at right angles. From this terminus of the street car line westwardly to the dwelling of Miss B. is about five thousand one hundred and thirty-six feet along said Enterprise street, a few feet less than a mile. Said Enterprise street runs out towards the west from the city of Jacksonville. At a distance of about three thousand feet west from the said terminus of the said street car

line the road-bed and tracks of the Atlantic Coast Line Railway Company cross said Enterprise street approximately at right angles. On the east side of, and within a short distance of, the last mentioned railway tracks, and situated on the north side of said Enterprise street, is the house and home of the defendant, where he had resided with his parents for several years prior to the crime. The defendant's parents resided here in a house standing on the front of their lot abutting on said Enterprise street, and the defendant and his brother occupied and slept in a small house or room located a few feet in the rear of their parents' house, but in the same enclosure or yard. From the said railway tracks at their crossing of said Enterprise street, and, practically, from the home of defendant to the point westwardly on Enterprise street where Miss B. was assaulted is about 1815 feet. For more than a year prior to the crime Miss B. had employment with a business firm in the city of Jacksonville and was for all of that time in the daily habit of going into the city in the early morning from her home and returning from the city to her home in the evening, generally leaving the city from six to half past six o'clock P. M. and generally rode on the street car to its terminus at said Myrtle avenue, from which point she generally walked to her home along Enterprise street, passing in close proximity to the defendant's place of abode. On the evening of the crime Miss B. took the street car in the city about five minutes before seven o'clock p. m. and, according to the proven street car schedule, arrived at the street car terminus at Myrtle avenue about seven, or ten minutes past seven o'clock p. m., from there, as was her daily habit, she walked along Enterprise street towards her home passing the defendant's home on her way. The night was dark with no lights upon said street. When she got to a point on Enterprise street about eighteen hundred and fifteen

feet westwardly from the home of the defendant and within about four hundred feet of her own home, and within about one hundred and thirty-two feet of the house of a Mrs. Wood, that was the nearest habitation to her outside of her own home, she was seized from behind by an unknown colored man who exclaimed on seizing her: "I have got you now." The man choked her and she offered him her pocket book, to which he replied: "I don't want your money." She begged him to turn her loose, to which he replied: "Shut up." Then he continued to choke her. Kicked her in the back and beat her with his fist about the head and in the sides and threw her, face downwards, on the ground, upon which she lost consciousness. When she regained consciousness she found that she had been dragged from the point of first attack to a point one hundred and sixty-five feet north of and at right angles to said Enterprise street among some pine-sapling trees, and when she regained consciousness she found herself lying partially on her side with her clothing pulled up above her waist, with her mouth, nose and eyes filled with sand, and realized that her private parts had been penetrated. She did not at any time during the encounter see the man who assailed her, as he kept behind her during the entire time while she was conscious—but she was positive that it was a negro man. She was so weak she had to crawl back to the street, then walked to the house of Mrs. Wood and told her what had happened, was taken from there to her own home, bathed and put to bed. A physician went out within from two to three hours after the commission of the crime, made a physical examination of her, and testified that she was considerably bruised and scratched about the head, face and throat, and there were bruises about her genital organs, and that her private parts had been penetrated. It was proven that the railway tracks at their crossing of Enter-

Mack v. State.—Opinion of Court.

prise street near the defendant's house are about one-half mile from the terminal depot in Jacksonville, from which depot different trains took their departure over said tracks on the night of the crime as follows: One train at about 7:45 o'clock p. m., another at about 8 p. m., another at 8:04 p. m., another at 8:05 p. m., and another at 8:20 p. m. Two nero men, witnesses for the state, testified that they both knew the defendant well, and had known him for eighteen or twenty years, and that on the night of the crime at about 8 o'clock they were standing together on Enterprise street, near the defendant's home, at the crossing of said Atlantic Coast Line Railway tracks over said street and on the east side of said railway tracks next to the defendant's house and while standing there together waiting for an approaching passenger train to get by the crossing they saw and positively recognized the defendant coming down Enterprise street in a run from towards the west, the direction in which the crime was committed, and that he ran across said railway tracks in the glare of the electric headlight on the approaching loco-motive, passed close to where they were and that he kept on running after he had gotten across the railway tracks; that he stumbled and fell in a ditch or sunken pathway that led up from the railroad crossing to a gate that entered his yard, that he got up and kept on running up the hill until he got to his gate. That the defendant was dressed that night with a dark colored pair of pants and vest and with a light colored shirt and carried his coat under his arm. Both of these witnesses corroborated each other in every material particular and were positive in their identification of the defendant as being the party they saw on the night of the crime com-ing on the run from the direction of the crime. A light colored shirt was taken from the defendant's room within a few days after the crime, and was acknowledged by

the defendant to be his shirt. This shirt had upon it some small stains that had the appearance of being blood stains, which were subjected to microscopical examination by a physician, who testified that they were blood stains but he could not tell positively whether or not it was human blood, but thought that it was. When the defendant was confronted by the sheriff with said light colored shirt he was asked by the sheriff if he had had connection with any woman while he had that shirt on, he at first answered that he had not, upon which the sheriff called his attention to the stains on the shirt and asked him: "How about this blood?" Upon which he stated that he had had connection with a woman on the Sunday night before the crime, on Monday, and that he did have on said shirt on said Sunday night. On Thursday or Friday following the Monday when the crime was committed, the victim of the crime Miss B. was placed in a position where she could not see who it was that was talking but where she could distinctly hear the talking, and four different negroes, who were suspected, were separately placed in a position where they could not see her and did not know of her presence, and were led into conversing in her hearing. After separately hearing these four talk she promptly declared that neither of them was the one who assaulted her—but when the defendant was placed in the same position and induced to talk where she could hear his voice distinctly but could not see him, and when he could not see her and did not know of her presence, she promptly recognized his voice as being that of her assailant and began to weep and cry: "Take him away. That's the man." She testified at the trial that she had never heard the defendant speak at any time prior to his assault upon her, but she was most positive that the defendant was the person who assaulted her by her recognition of his voice, as being the same voice that

she heard at the time of the assault upon her.    The defendant, who was shown to be about 21 or 22 years of age, introduced several witnesses to prove an alibi. This evidence was very unsatisfactory and several of his witnesses contradicted the defendant himself as to the time that he went home the night of the crime. He.testified that he got home about 8 o'clock or a little before 8, ate his supper, smoked a cigarette and then went to bed in the room at the back of his father's house where he and his brother Sonny Mack always slept together in the same bed.    That when he went to bed his brother, Sonny Mack, was not there, and that he heard the trains go out after he got in bed.    The defendant was flatly contradicted by his brother Sonny Mack who testified in rebuttal that he (Sonny) went to bed early at a little before seven o'clock on the night of the crime, and that when he got in bed the defendant was standing around in the room with him, that he went to sleep immediately and left the defendant standing up in the room, that he did not know whether the defendant went to bed then or not as he himself went to sleep at once.

The only positive evidence in the case, aside from some corroborative circumstantial evidence, that identifies the defendant as being the perpetrator of the crime is that of the victim of the crime, who without any hesitation or reservation positively identified him by his voice alone, she never having heard his voice at any time prior to the crime, and not having seen him at the time of the crime.    It is contended here that this character of evidence is too uncertain and unreliable to support a verdict of conviction upon; that its uncertainty and liability to mistake necessarily gives rise to a reasonable doubt as to the identity of the criminal, that, in law, compels an acquittal.    We cannot agree with this contention.

As long ago as the year 1660, in the trial of the

regicide William Hulet, a witness was permitted to identify the defendant by his voice. 5 Howell's State Trials, 1186-1187; Henry Harrison's Trial, 12 Howell's State Trials, 834, text 861; Trials of the Threshers, 30 Howell's State Trials, 198, and ever since this early period it has been universally recognized by the courts on this continent and in England as being admissible and legitimate evidence to establish identity. In the case of Commonwealth v. Hayes, 138 Mass. 185, it was was held to be competent evidence to support a conviction, where a prosecuting witness identified the defendant solely by his voice, and where the witness had never heard the defendant's voice but once before the commission of the crime, and that on the same day that the crime was committed, and then heard him speak only a few words. So also the case of Commonwealth v. Williams, 105 Mass. 62.

In Ogden v. People, 134 Ill. 599, 25 N. E. Rep. 755, it is held that: "The statement of a fact by a witness which he ascertained through the sense of hearing, is not the statement of mere matter of opinion, but is the statement of a conclusion reached directly and primarily from an operation of the sense of hearing, and is admissible in evidence." State v. Herbert, 63 Kan. 516, 66 Pac. Rep. 235; State v. Hopkirk, 84 Mo. 278; Price v. State, 35 Tex. Cr. App. 501, 34 S. W. Rep. 622.

In Givens v. State, 35 Tex. Cr. App. 563, 34 S. W. Rep. 626, it is held that the positive identification of a person by his voice is not a case of circumstantial evidence. Davis v. State, 15 Tex. App. 594.

In the case of Fussell v. State, 93 Ga. 450, 21 S. E. Rep. 97, it is held that testimony identifying the accused solely by his voice was admissible, and that its probative value was a question for the jury.

In the case of Patton v. State, 117 Ga. 230, 43 S.

E. Rep. 533, where the homicide was committed at night, and where a state's witness, one Bomar, very uncertainly, as was thought by the majority of the court, identified the accused by his voice at the time of the commission of the crime, Mr. Justice Candler, dissenting from the reversal agreed upon by the majority of the court, in which dissent he was joined by Justice Fish, very aptly, as we think, comments on the rule that should obtain before an appellate court in such cases where a jury and the trial court have both passed upon the sufficiency of such testimony, as follows: "Reduced to its last analysis, the judgment rendered by the majority must rest upon the idea that the jury were not authorized to believe the witness Bomar, because as a matter of law, the things to which he testified were impossible. I do not think this position tenable. That it is unusual for a man to recognize voices and figures as Bomar claimed to have done may be conceded; but who can say that it is impossible? It is probably true in the experience of every man that he has on numerous occasions recognized voices, faces, or figures when he could not, had his life depended on it, have told by what means he recognized them—the only thing of which he was certain was that he did recognize them. So subtle are the workings of the human mind, so elusive the landmarks by which the consciousness guides itself, so fleeting and momentary the touches upon the waxen scroll of memory, that oftentimes all we have left of the mental operation is its net result. We have reached a point, surely and safely; but for the life of us we cannot tell over what road we traveled. Who is it that has not heard a voice, with nothing definitely peculiar about it, which he would yet be willing to swear to if he heard it again?' And so in the present case, may what we have said be properly applied to the witness Bomar. He swore in effect: 'I recognized Patton by his voice and the gen-

eral contour of his figure. He spoke several times. While I had only heard him speak on a few occasions formerly, I am very sure that the voice I heard was his.' The jury heard this evidence; they looked upon the witness and they believed him, as I am convinced that they had a perfect right in law to do." Underhill on Crim. Ev., §56.

In the case under discussion it may be admitted that ordinarily a party casually meeting a stranger under peaceful circumstances, and for the first time hearing his voice in the utterance of a few ordinary words, would not in all human probability be able positively to identify such stranger again solely by his voice, unless it had about it some uniquely impressive quality or characteristic; but the circumstances under which the witness in this case first heard the voice of this defendant were extraordinary. The manner, time and place of his assault upon her threw her instantly into the highest state of terror and alarm, when all of her senses and faculties were at the extreme of alert receptiveness; when there was nothing within her reach by which to identify her assailant but his voice. Who can deny that under these circumstances that voice so indelibly and vividly photographed itself upon the sensitive plate of her memory as that she could forever afterwards promptly and unerringly recognize it on hearing its tones again—as unerringly as the perpetuated sound waves of the phonographic record. In law it was competent and admissible evidence, and the jury were the sole judges of its probative weight and force. But this testimony does not stand alone. The defendant by his own testimony was shown to be possessed of brutally lecherous proclivities. He was a young man at the height of sensual vigor; he had been so situated for years as to be perfectly familiar with the daily movements of his victim; he was shown to have been in the close vicinity of the scene

of. the crime at the time of and prior to its commission, and was seen and positively identified by two witnesses coming at a suspiciously fast gait from the direction of the scene of the crime at a time which allowed abundant opportunity for him to have committed it and to have gotten back to the point near his home where he was so seen. His suspicious haste at the time he was so seen and recognized is not accounted for by any apparent desire upon his part to get out of the way of the approaching train that was about to cross his path, since he kept on running after he had crossed the railway tracks until he reached the gate that led directly into his den. He told conflicting stories about the shirt that the two witnesses swore that he wore on that occasion, and was flatly contradicted by his own brother as to the time when he swore that he went to bed that night. That his victim was carnally ravished the evidence admits of no reasonable doubt. Under all these circumstances, in view of the fact that there is nothing shown in the record inconsistent with the fact that the defendant's voice may have had such peculiarities and characteristics about it, when exhibited to the jury who heard him testify, as to have made it easily and unmistakably distinguishable from other ordinary voices, we cannot, after the most careful consideration, feel justified in holding that the verdict of the jury is not sustained by the evidence, particularly when their finding has been upheld by a most painstaking, careful and conscientious trial judge, and when the defendant's every right was so ably, conscientiously and dutifully guarded at the trial and before this court by learned and experienced counsel assigned for his defense by the trial judge.

The judgment of the Circuit Court in said cause is hereby affirmed at the cost of Duval county it being shown by the record that the defendant is insolvent.

HOCKER and PARKHILL, JJ., concur;

SHACKLEFORD, C. J., and COCKRELL and WHITFIELD, JJ., concur in the opinion.