# Richmond

WALTER PAUL HARRISON v. COMMONWEALTH OF VIRGINIA.

November 20, 1944.

Record No. 2882.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*J. M. Turner, A. Clair Sager* and *Leith S. Bremner,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *Edwin B. Jones, Assistant Attorney General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Walter Paul Harrison was, on August 8, 1943, indicted in five separate indictments for the murder of his wife and four infant children, all of whom met their death by drowning on June 25, 1943, when the automobile occupied by them ran backwards into an abandoned quarry filled with water. Harrison was tried on the indictment charging him with the murder of his wife. On September 25, 1943, a jury found him guilty and fixed his punishment at death. Judgment was accordingly entered on January 14, 1944. That judgment is now before us on a writ of error.

There are five assignments of error made in the following order:

The first assignment is that the jury was improperly selected.

The case came on for trial September 15, 1943. Because of the nature and widespread publicity of the shocking tragedy, it was difficult to secure the required number of qualified jurors. From an original list of fifty-four prospective jurors summoned, only thirteen were found qualified. From another list of twenty-five persons summoned for September 16th, only five were accepted. Another writ of *venire facias* was issued commanding the sergeant to summon twenty persons for September 17th. The list filed by the sergeant, under Virginia Code, 1942, (Michie) section 4895a,* did not show the occupation of each venireman summoned. The defendant moved to quash the writ of *venire facias* on the ground that it failed to conform to the statute.

---

*Section 4895a.—"Every sheriff and city sergeant, after executing a writ of venire facias for a petit jury, shall prepare a list showing the name, occupation and address of each venireman summoned, and shall deliver said list to the clerk of the court from which said writ is issued, and it shall be the duty of the clerk, upon request, to exhibit said list to the parties or counsel; but no inaccuracy in said list shall constitute error."

This motion was not made until three p. m. on Friday, September 17th, although the list of veniremen was available to his counsel at ten-thirty a. m. of that day. The court instructed the sergeant to write the occupations on the list. When counsel for the defendant stated that he did not have time to investigate the veniremen on the corrected list, unless court was adjourned, the court offered to adjourn for as long as it might be necessary for him to thoroughly make an investigation. Counsel declined to avail himself of the opportunity. The court thereupon overruled the motion, and the defendant excepted. One person from the list was found qualified as a juror, and the case was continued until Monday, September 20th, at which time the panel was finally completed.

On September 20th, the defendant moved to quash the *venire facias* issued on September 17th, returnable on the 20th, on the ground that the list of names thereon had not been made available to him until the day before. To the action of the court in overruling this motion, the defendant excepted.

Section 4895a undoubtedly is for the purpose of affording an accused and his counsel opportunity to investigate the prospective jurors, and to enable them to make proper challenges. The defendant, in declining to accept the court's offer to adjourn, waived the issue as to his first motion. It was an inaccuracy that was promptly corrected. Section 4895a specifically provides, that "no inaccuracy in said list shall constitute error."

In his second motion the defendant did not ask for an adjournment. He had ample opportunity to do so. It does not appear that any injustice was caused to the defendant.

The second assignment of error contends that a venireman, R. E. Ganzert, who was stricken from the completed panel on peremptory challenge, should not have been originally accepted as a qualified juror. Ganzert was questioned closely as to his qualifications on his *voir dire*. In answer to the question whether he had expressed any opinion as to the case, he said:

"A. Well, when I read the morning paper, I was eating breakfast, and my wife was across the table, and I read it, and I made the statement to her, 'Didn't look right to me.' And I made the statement the young man would have a hard time. But I haven't formed any definite opinion; but I have thought seriously in the matter."

Throughout his further examination, he unqualifiedly stated that he had not formed any definite opinion; that he only expressed himself as to the newspaper report of the case; and that he was entirely impartial and would give the defendant a fair trial according to the law and the evidence. His attitude and answers positively negative any bias against the accused. No persuasion or coercion was exercised to secure his answers.

In this day and generation, most intelligent persons read newspapers. Surely, such a person would be interested in a newspaper story of a tragedy in his city or county causing the death of five members of one family. He would doubtless receive some impression from its reading. But, in the absence of a fixed impression, bias or prejudice created thereby, he would not be disqualified to serve as a juror where he says upon his oath that he can render a fair and impartial decision after hearing the whole case, and every indication negatives prejudice or partiality on his part. The decision on this point is controlled by *Abdell* v. *Commonwealth*, 173 Va. 458, 2 S. E. (2d) 293, and cases therein cited, wherein the facts were very similar to those now before us. The cases relied on by the defendant involved a different set of facts. There is no merit in this assignment of error.

The third assignment of error is based upon an alleged improper view by the jury of the automobile involved in the tragedy. The view was held in the storage room of an automobile company. It is contended that there was no evidence that the car was in substantially the same condition as when taken out of the quarry, and that two jurors, who got under the car to make a personal investigation, might have

found something not seen by the remaining jurors. It is suggested that these two jurors might have conveyed their findings to the others.

The view was taken with the acquiescence of the defendant, the defendant and his counsel being present. No objection was made to anything that occurred, either during the progress of the trial or upon the motion in the trial court to set aside the verdict. Error is assigned here for the first time. No request was made by the defendant to present evidence as to the condition of the car, nor is there anything in the record which shows that the jurors, who got under the car, found its condition other than as testified to by several witnesses, or that they discovered any new matter. The objection comes too late in this court. The trial court had no opportunity to rule upon it. No prejudice is shown to the defendant, and the assignment is insufficient.

The defendant next contends that the verdict is without evidence to support it, in that the *corpus delicti* was not proven. Since the case must be retried for other reasons, it would be improper to set out the evidence in detail, or comment upon the materiality of particular facts and circumstances.

The quarry into which the automobile occupied by Mrs. Harrison and her four children fell was filled with water to an unknown depth. The automobile, a 1929 model Ford coupe, was found at a depth of fifty feet. The water arose to within five feet of the top of the quarry, and there was a sheer drop of five feet, nine inches from the surface of the land to the surface of the water at the place where the tragedy occurred. The descriptions of the surface of the land surrounding the quarry at this place were more or less contradictory.

The car had been parked by Harrison with its back to the pool. When rescued therefrom, its gear was found in reverse, its ignition switch on, and its gasoline throttle open.

The theory of the Commonwealth is that the defendant caused the automobile to fall into the quarry, with the intent

to destroy his wife and children, and that his motive therefor was to free himself from the bonds of matrimony, in order that he might continue an existing illicit love affair with a young unmarried woman and marry her. The evidence in support of the offense alleged is almost entirely circumstantial.

The defense of Harrison was that the drowning was accidental and resulted from the starting of the motor by the act of someone in the automobile stepping on its starter, while he was beneath the car, working on its faulty clutch. He was the only eyewitness to the tragedy, except his eight year old child. He said he did not attempt to rescue the persons in the pool because his leg was injured when the car ran over him and for other reasons.

No question was raised as to the admissibility of any of the evidence, and there was no motion to strike the evidence.

The jury was given twenty-five instructions, without objection, covering all phases of the case, ten being given at the request of the Commonwealth, and fifteen at the request of the defendant.

Suffice it to say, that the evidence and the reasonable inferences therefrom were sufficient to present the question, whether the death of Mrs. Harrison was a result of the criminal agency of the defendant, or was merely an accident for which the defendant was not responsible. If the jury believed that the evidence disclosed the criminal agency of the defendant, they were further to ascertain, under the instructions, the grade of the offense. These issues were peculiarly for the consideration of a jury.

In reaching a decision upon these vital questions, it was, of course, essential that the jury should not be actuated by any pressure or influence calculated to prejudice the rights of the defendant, and this brings us to a consideration of the last assignment of error.

The defendant vigorously contends that the argument of the Commonwealth's Attorney was improper. We often have been confronted with this question. See *Bateman* v.

*Commonwealth, ante,* p. 253, 32 S. E. (2d) 134, this day decided, and cases cited.

While the Attorney for the Commonwealth is charged with prosecuting one accused of crime, it is also his duty to see that the accused is accorded a fair trial. Conviction should rest upon reason alone, and not upon appeals to emotion, sympathy, passion, or prejudice. Intemperate and inflammatory argument calculated to divert the minds of jurors from the real issues involved is improper. There are many cases in which the effect of such argument cannot even be overcome by direction to the jury to disregard it. One accused of crime is entitled to a scrupulously fair and impartial trial. Nothing should be done or permitted to prejudice his case, or to obscure in the minds of the jurors the question, whether the evidence justifies them in a conclusion that he is guilty of the offense charged. *Dingus* v. *Commonwealth,* 153 Va. 846, 149 S. E. 414; *McReynolds* v. *Commonwealth,* 177 Va. 933, 15 S. E. (2d) 70; *Taylor* v. *Commonwealth,* 180 Va. 413, 23 S. E. (2d) 139.

In this case, the Commonwealth's Attorney, in his closing argument to the jury, said, in part:

"Now, let us go another step and find out what type of man we are dealing with; whether he can be trusted and whether he is not a *traitor* to his country. * * * Why the *blackest Hottentot in darkest Africa,* with a ring in his nose, *would show more emotion than this man has shown.* * * * Gentlemen, I submit that this man is a cool, deliberate murderer of his wife and *family* and he ought to be sent to the electric chair; if ever there was case this is certainly one. * * *

" * * * I don't ask you to get all worked up about it, but you are dealing with someone now that when a man tells you a thing of that kind and he has a right heart, don't you believe that the *blackest savage in Africa, with a ring in his nose,* would have jumped in and made some effort to get them out, and what did he do; not a bit of effort.

" * * * *The most diabolical murder that has been committed in these parts in the memory of man.* Gentlemen,

I say to you, as I stated in the beginning, from the Commonwealth's standpoint, on the evidence produced here, *I see no way under heaven that you gentlemen can turn this man loose.* As I have stated before, *there is not a Hottentot in darkest Africa that would not have gone in that quarry to try to rescue his family, or that would have acted as he did. If you believe that you have got to convict him.* * * * Gentlemen, if this is not a case for the electric chair you might as well disconnect it. * * * *It is not up to us to explain how that car went over there.* * * * *I respectfully submit that he is the man to satisfy you about what happened there and he has not done it."* . (Italics supplied.)

At this point, counsel for the defendant objected to the argument as being contrary to the law and the instructions. The Commonwealth's Attorney replied: "If your Honor please, I wish to state that if I have stated anything contrary to the instructions laid down by the Court I want your Honor to instruct the gentlemen of the jury right now to disregard it."

Whereupon, the court said: "Gentlemen of the jury, you have heard the remarks made by the Commonwealth's Attorney, disabuse your minds of any wrong construction placed upon any of you gentlemen by those remarks."

Thereafter, continuing the argument, the Commonwealth's Attorney said: "Here is a man who goes down and puts his family in a position that no *Hottentot*, as I told you this morning, would dare to do. Then he stands on the brink of that quarry and watches the oily bubbles, if you please. I suppose that there was some hair there somewhere from his wife's head. Do you remember, he thought they were not in there because he could not discern the difference in the bubbles. He saw this woman come to the top and her hair floating around and he did not get in there and make any attempt to rescue her. Anybody with a right heart, that thought anything of his wife, and if the story is like he told it, *would have gone in there if they did not have but one arm, much less two legs.*

" * * * *I see no way on earth that you can turn this man loose,* and you have the motive and everything, the way he acted, as I said to you this morning, as developed by the evidence and submitted by the Commonwealth, it is one of the most cold blooded, premeditated and planned murders I could imagine, and the *only reason he did not make a clean sweep of the children* was this little girl got out the car and he did not know anything about it." (Italics supplied.)

The defendant was not on trial as a traitor for disloyalty to his country.

What was meant by comparing the white defendant to a "Hottentot" we do not know. There was no evidence that the defendant was a creature with the likeness and the instincts of an aborigine. The Encyclopaedia Britannica (11th Ed. Vol. 13) describes the Hottentots as being a primitive African people, apparently sprung from cross-breeding between negro tribes, having a peculiar manner of speech, a leathery color, and negroid features. They observe polygamy. We do not know what grotesque picture the repeated reference created in the minds of the jurors, nor what characteristic of the Hottentot was impressed upon them, nor, in fact, whether the jury knew precisely what was meant.

The remarks of the Commonwealth's Attorney with reference to the burden of proof were not a full, fair, and complete statement, and were in conflict with the instructions of the court. They were subject to misconstruction.

The burden was on the Commonwealth to satisfy the jury beyond all reasonable doubt that the death of Mrs. Harrison was caused by the criminal agency of the defendant. An accused is not required to prove his innocence. He is entitled to the legal presumption of innocence until he is proven guilty.

The court did not tell the jury whether the remarks objected to were improper or not, or how they were to be construed. It left it to the jurors themselves to determine whether the remarks were improper and whether they had placed any wrong construction thereon. It was the duty of

the court to construe the propriety of language, and to tell the jury what was improper argument. There was no full retraction of the objectionable language by the Commonwealth's Attorney, nor any ruling of the court as to whether or not it was improper.

 The remarks of the Commonwealth's Attorney are, perhaps, explainable upon the ground that they took place in the intense heat and strain of the trial. They are, however, neither justifiable nor excusable.

The Commonwealth contends that no proper objections were made to the argument of the Commonwealth's Attorney, and no proper exception was taken to the court's ruling. The answer to this is that each case must be considered upon its own peculiar facts. If the statements may be fairly calculated to prejudice the jury and the court fails or refuses to check such argument or properly instruct the jury, or if they cannot be overcome by direction of the court, a new trial may be allowed to prevent injustice. *Spencer v. Commonwealth*, 143. Va. 531, 129 S. E. 351; *Funk v. Commonwealth*, 163 Va. 1014, 175 S. E. 861; *Chesapeake, etc., Ry. Co. v. Folkes*, 179 Va. 60, 18 S. E. (2d) 309.

The language of the trial judge was of so little meaning as to hardly constitute a ruling. It was an insufficient direction to the jury. While it would have been better had counsel for the defense followed up his objection, we do not think that the circumstances constitute a waiver of the defendant's rights in connection therewith. The defendant has not had the character of trial guaranteed to him under the law.

Because of the improper argument of the Commonwealth's Attorney, the judgment is reversed and the case remanded for a new trial.

*Reversed and remanded.*