# Staunton

## VIOLA OPANOWICH v. COMMONWEALTH OF VIRGINIA.

September 8, 1954.

Record No. 4261.

Present, All the Justices.

The opinion states the case.

*William C. Nemeth, Leonard S. Sattler* and *John G. Drake,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Francis C. Lee, Assistant Attorney General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

The defendant, Mrs. Viola Opanowich, has been sentenced to serve twelve years in the penitentiary for killing her infant son, pursuant to the verdict of a jury finding her guilty of murder in the second degree. She asks us to reverse and set aside the judgment of conviction as contrary to the law and the evidence. More specifically, she contends that the evidence did not establish the *corpus delicti,* that the trial court erred in admitting and rejecting certain evidence, and in granting an instruction defining the several degrees of homicide.

The evidence of the Commonwealth showed the following facts and circumstances:

On February 5, 1953, Mrs. Opanowich gave birth to a male child at her home, 1115 South 18th Street, Arlington, Virginia. She was alone and unattended.

Julius E. Sherr, who lived in Washington, D. C., testified that he had known the defendant for about four years. He said that on February 11, 1953, he had two telephone conversations with her. She called him about a quarter to eleven a. m., and after conversing for a while she hung up the telephone, saying somebody was listening on the line, and calling him back a short time thereafter. She told

Sherr she wasn't feeling so good; that she had had a baby and hadn't slept for two days; and that the baby was sick. He said he did not know she was married, and said to her, "Let's get married." She replied that there were too many technicalities. She appeared to him to be very excited. She told him the baby weighed about eight pounds, was a week old, and perfectly normal. She said the baby drank all of her milk, was crying all the time, and took all of her strength. She said that she did not want the baby, and was going to throw it in the furnace. He told her not to do that, that he would come over and get it. She said that he could come; but quickly changed and said "Don't," because his coming might attract attention. She said Peter, her husband, would help her out.

The next day, Thursday, February 12th, she again called Sherr, and asked him for some money. He asked her if everything was all right, and she said "Yes." She then told him, "We have got to get rid of it," the baby. He sent her $30, the receipt of which was acknowledged by her in a telephone conversation about 5:30 a. m. on Friday, the 13th. In another conversation on Friday, he called her and asked her if she wanted him to come over to her home to live. She replied that he could do so. He moved into her house in March, 1953, and still lived there at the time of the trial in May, 1953.

Mrs. Marion Lowe, a daughter of the defendant, and a resident of near-by Alexandria, testified that her mother called on the telephone on Tuesday, February 10th, and told her she had given birth to a baby boy. She thought her mother then seemed pleased; but when she called her again on the morning of February 11th, she appeared to be emotionally upset. On the second call, she said the baby was sick, and that she was trying to do all she could for it. They had some conversation about clothes for the baby. Mrs. Lowe went by automobile to her mother's home that evening about eight o'clock, taking two suit cases of infant

clothes with her. She got out of the car, went to the porch of her mother's home, her mother came out of the house, and told her the baby was dead. Mrs. Opanowich said that she had not called in a doctor for fear that some issue might be raised over the fact that she was unattended when the baby was born, and had made no report of the birth. The defendant asked her daughter for help. Mrs. Lowe said she refused at first; but when it seemed to her that her mother needed aid she consented. Mrs. Opanowich then went downstairs in her house, and came out through the driveway bringing with her a package tied with a string. She got in the car, put the package in a basket, and the two women drove around aimlessly for sometime. It was cold and there was a hard rain. Finally, they came to a field, the daughter stopped the car, Mrs. Opanowich got out, took the package with her, and left it in the field. Mrs. Lowe did not hear any noise coming from the package.

Mrs. Margaret Cutcomb, who lived next door to Mrs. Opanowich, over the objection of the defendant, testified as to certain conversations she overheard on the telephone. Mrs. Cutcomb's telephone was on a two-party line, the defendant being the only other person having that line. The witness said that she did not know the defendant and had never seen her.

Mrs. Cutcomb testified that on February 11th, 1953, she twice heard telephone conversations between two persons, one bearing the name of "Viola" and the other the name of "Julius." She recognized the voices as those of the same two parties whom she had overheard on the telephone every day since the preceding November. On one prior occasion, she had heard the voice she identified as that of "Viola" call a store and order dog food, giving her full name and address as: "Viola S. Opanowich, 1115 South 18th Street, Arlington," the residence of the defendant. On another occasion, she had heard the same voice give her name as "Viola" and heard her address the person to whom she was

speaking as "Julius." She identified the voice of the man speaking on February 11th as that of "Julius."

Mrs. Cutcomb took notes of the conversations on February 11th, and, referring to her notes, stated that the voice she identified as that of "Viola" said during the first talk, shortly after 11:00 a. m.: "Something terrible has happened. I can't tell you." Julius asked: "Are you pregnant?" She replied: "Worse, a baby." He said: "Mine?" She said: "Yes." Viola told him the baby was six days old, a perfectly normal boy, and weighed about eight or nine pounds, and said: "What are we going to do? We will have to get rid of it." He replied: "This is all of a sudden. I don't know what to do. Does Pete know?" She replied: "Yes, he knows about the baby, but not about you." Julius asked about coming to her home and the means of getting there. She told him to "take a cab or something." The defendant then told Julius she couldn't stand it any more; that she had to nurse the baby day and night; and that he would have to come when Pete was away between five and two o'clock. She said her daughter, Mrs. Lowe, was going to come over that night, and he asked if he couldn't meet Mrs. Lowe somewhere and "take the baby and she could drop me." She told him not to do that. He then suggested that he would come over on the bus, take the baby in a basket, go to the police, and tell them that he had found it. She said that she did not have a blanket or basket. She refused to let him call a doctor or to come and get the baby, saying "You will have to give your name. * * * No, it would cry and you would have to suffocate it first."

On the second call Viola said to Julius that she "shouldn't have called him in the first place" and that she "could take care of it." He asked: "How are you going to do it?" She told him: "I can do it." She then said: "There he is crying. Do you want to hear him cry?" Julius said: "No," at first; but then said: "Yes, let me hear him." Mrs. Cutcomb heard the sound of the baby crying. When the crying stopped, Viola explained: "Now I am nursing it."

Julius laughed.   Viola said:   "This isn't funny.   What are
we going to do?    We have got to get rid of it."   He said:
"How?"  She said:   "Oh,  throw it in the furnace or some-
thing."

During the conversation Mrs. Cutcomb heard Julius sug-
gest that he and Viola get married.  She gave him a negative
answer, setting out an indefinite reason for her refusal.

The witness further testified the defendant informed Sherr
that her daughter was going to inform the latter's husband
about the birth of the baby; tell him that a doctor had been
called; that the doctor came; that they went to the hospital;
and that the baby was born dead.

The Police Department, having been informed of the
telephone conversations overheard by Mrs. Cutcomb, made
an investigation.   Doris K. Beiswanger, a policewoman, and
William Dinsmore, a police detective, went to the defend-
ant's home between 4:00 and 5:00 p. m. on February 13th.
They asked her about the baby, and she admitted its birth.
They then asked her if it had been put in the furnace, and
she said "Yes."   The policewoman accompanied the de-
fendant in an ambulance to a hospital.   On the trip, the de-
fendant asked:   "What are they going to do, give me the
chair?"    The policewoman said she couldn't answer the
question.   Thereupon, the defendant said:   "Oh well, I
have lived a full life.  I am not afraid of death."

The above officers and Walter Kadel, another police de-
tective, testified to several conversations had with the de-
fendant.  She gave them vague and misleading answers; but
repeatedly said that she had placed the body of the infant in
the furnace.  She also voluntarily gave them a signed written
statement to the same effect.  The officers sifted the ashes in
the furnace; but found no evidence of human remains.  They
then interviewed Mrs. Marion Lowe, who told them of the
actions of herself and mother on the evening of February
11th, and of the place where the defendant had left a pack-
age.  The officers then went to the designated place, and
there in a thicket of weeds and honeysuckle found the body

of the baby. It was wrapped with several sheets of news-paper and placed head down in a brown shopping bag.

The defendant told the officers that her child was born on February 5th; that it weighed about six pounds, its legs were deformed, and it lived a short time, approximately two or three days; and that it made her nervous to nurse the child and she had to feed it partly with bottled milk. She said it was not the child of her husband, although he thought so. He knew she had the child; but did not say anything when she told him the child was gone. He did not know what had been done with its body. In a written statement, she first said that she did not know who was the father of the child; but later she corrected the statement and wrote in the name of a person, a stranger to this proceeding, as the father of the child. At another time, she stated that a few months earlier she had been attacked at night by a man; but made no report to the police. She did not know whether the man was black or white. She then expressed herself as pleased that the child was not a Negro.

Dr. W. C. Welburn, the coroner for Arlington, stated that he examined the body of the dead baby, and that it was a well formed, full time baby, weighing over seven pounds, clean and apparently well taken care of. When the body was brought to him, he found it placed head first in a shopping bag, so that the weight of its body was borne by its face and the face was "somewhat contorted by pres-sure." After receiving the findings of the county patholo-gist, he certified that the cause of the infant's death was "asphyxiation, probably suffocation."

Dr. William D. Dolan, pathologist and chief medical ex-aminer for Arlington County, testified that he performed an autopsy on the body of the infant, carefully examined its throat and other organs, and took specimens for microscopic examinations. He found a mild infection of the larynx and changes in several other organs, which did not, in his opin-ion, represent sufficient natural disease to cause death. The infection was about the size of the head of a common pin,

and could not interfere with the normal breathing of the child. He thought the body changes noted in his findings were merely incidental to its death from suffocation. He said that its death could have been caused by any "mechanical obstruction to the nose and mouth by holding your hand, or better, a pillow, or some object which would force the normal apertures of the mouth and nose to be closed by pressure on the face." In view of conditions disclosed by miscroscopic examinations of parts of the body and throat of the dead infant, he said, "My diagnosis was asphyxia, probably due to smothering, suffocation." He defined asphyxia as "an interruption of the normal process of breathing."

The defendant presented as a witness Dr. Jacob Werne, a pathologist of considerable experience. Dr. Werne said that he had reviewed the autopsy findings of Dr. Dolan, and had examined the slides and other material obtained when the autopsy was made. He analyzed the report of Dr. Dolan, exhibited the slides under a microscope to each member of the jury, explained the objects shown and exhibited, referred to certain diagrams and drawings in evidence, and said that he thought the diagnosis of Dr. Dolan was unwarranted and unsupported by the evidence obtained in the post-mortem examinations. He said that the slides and material exhibited disclosed that there were changes in the larynx of the baby, which satisfied him that it had a serious respiratory disease which could have caused the death. He did not think the changes or lesions, as he termed them, interfered with the child's breathing. He declared that there was no evidence that it had been smothered. In his opinion, the baby "probably died of a fulminating respiratory disease." He admitted that he did not know the cause of the disease; but thought it probably resulted from a virus rather than from bacteria. He further stated that the disease was a common infection appearing in babies "usually two and three months of age" and "less common at one, month than at two

months." He added that "a fatal infection of this sort is not very common."

Dr. Werne further sought to present to the jury certain specimen slides he had taken relating to fulminating respiratory infections in other infants who had died suddenly. Upon objection by the Commonwealth, the trial court refused to allow the admission of such specimen slides in the absence of any proof that the conditions of the cases shown on such slides were identical with the conditions present in the body of the Opanowich baby.

Dr. Amino Perretti, a physician and psychiatrist, in answer to a hypothetical question, expressed the opinion that the defendant was suffering from a severe emotional strain, at the time of the death of the child and when its body was placed in the field.

Mrs. Opanowich testified that she had talked to Sherr over the telephone almost every day for several years, and had one or more telephone conversations with him on February 11, 1953. Questioned about the subject of the conversations on the 11th, she was evasive, confusing, and misleading. Asked if Sherr indicated to her that he thought he was the father of the baby, she replied: "Any one could be the father of the baby," and then said she did not remember what he indicated. Asked if she remembered telling Julius about putting the baby in the furnace, she replied: "The word 'furnace' means a great deal in this case, and you are leading yourself into it." Asked to explain her answer, she replied: "It was for the benefit of your ears and my angry tipster." She remembered telling the police detectives on the night of February 13th, that the baby had been put in the furnace.

She said the baby was born February 5th; that it was not healthy; that she did not remember whether it had deformed legs or not; that she had to feed it, in part, with sterilized water and "Carnation" milk; and that she was glad to have the child and had made some plans and preparations for its arrival, but that she did not have any medical service.

She said the baby had been left in the bed where she slept, surrounded by bedclothes and three pillows, and that after attending to her duties around the house for an hour, she returned to her bedroom and found him dead. She did not recall whether he was lying face up or face down. She stated that she was under a great emotional strain and did not remember exactly what took place on February 11th, nor why it took place. She admitted a slight remembrance of her daughter coming to her house on that night, and of riding in the automobile carrying a package. She denied that she was in any way responsible for the death of her child.

Dr. Dolan, recalled in rebuttal, testified that he could not conceive how any of the matters or things pointed out by Dr. Werne could have in any way obstructed the breathing of the infant or caused its death. He re-affirmed his conclusion that the child died from an interference with its breathing function, and that the condition of the lungs indicated that he had been deprived of oxygen by some outside mechanism.

Before considering the assignment of error that the *corpus delicti* was not established, it is necessary to determine whether the trial court erred in the admission and rejection of evidence.

The defendant argues that the testimony of Mrs. Cutcomb as to the telephone conversations she overheard on February 11th, was inadmissible, because she, the defendant, was not sufficiently identified as a party to the conversations.

The authorities are generally in accord that conversations overheard on a telephone are admissible as substantive evidence when the identity of the parties to the conversation is established, either by direct evidence or by facts and circumstances, or is admitted. 22 C. J. S., Criminal Law, § 644, page 983; 31 C. J. S., Evidence, § 188, page 908; 20 Am. Jur., § 351, page 326 and § 366, page 334; *De Lore* v. *Smith*, 67 Or. 304, 136 Pac. 13, 49 L. R. A. (N. S.) 555.

In an annotation to the case of *Mack* v. *State*, 54 Fla. 55, 44 So. 706, in 13 L. R. A. (N. S.) at page 373, it is said:

"The cases with great unanimity sustain the ruling in *Mack* v. *State*, that a witness may be permitted to identify a person solely from having heard his voice, and such testimony will be admissible and legitimate to establish identity."

In an exhaustive annotation entitled "Admission of telephone conversations in evidence," and reviewing numerous authorities, this is said in 71 A. L. R., at page 36:

"It is generally held that a person may be recognized and identified by his voice if the witness is acquainted with it."

See also page 64 of the same annotation and supplement thereto in 105 A. L. R. 326, 339, 340.

In *Nelson* v. *Commonwealth*, 168 Va. 742, 749, 750, 191 S. E. 620, referring to a conversation overheard by a telephone operator, we said:

"While under the circumstances the probative value of this evidence, which was denied by the accused and his mother, may not be great, the jury had a right to consider it together with the other evidence in the case, * * *."

Although not directly in point, because the facts are different, we held in *Atlantic Coast Realty Co.* v. *Robertson's Ex'or.*, 135 Va. 247, 261, 116 S. E. 476, that the rules pertaining to the admissibility of the testimony of a bystander who relates one side of a telephone conversation, "are governed by the same general rules of evidence which govern the admission of oral statements made in original conversations, except, of course, that the party against whom the conversation is sought to be used must be identified; but the identity of the other party to the conversation may be established either by direct or circumstantial evidence." (135 Va. 261). See also *Benson* v. *Commonwealth*, 190 Va. 744, 751, 58 S. E. (2d) 312.

It is to be noted there is no contention here that the conversations of February 11th did not take place between the defendant and Sherr. It is merely contended that because Mrs. Cutcomb did not personally know the persons con-

versing, she could not identify them. Both the defendant and Sherr admitted they were constant users of the telephone over a long period of time; and that they were engaged in at least two conversations on February 11th. Sherr specifically identified the defendant and the subject of their conversations. She admits that Sherr was the man she was talking to and that they discussed the birth of her baby. Neither of them specifically denied that Mrs. Opanowich made the incriminating statements attributed to her.

The sufficiency of the identification and the credibility of Mrs. Cutcomb's testimony were matters for the jury to consider. If believed, the statements attributed to the defendant showed the exercise of an intent, design, or plan on her part to get rid of the child, and they were relevant to show that the act was done probably as planned. 6 Wigmore on Evidence, Third Edition, § 1725, page 79, *et seq.*

The next question is whether the trial court erred in refusing to permit Dr. Werne to exhibit specimen slides taken from the tissues of other dead babies. It was not shown that the other babies died under circumstances identical with those here. They only tended to show that such other babies had an identical disease at death. Neither the ages of such other babies nor the degree of the infection was shown to be the same as in the case of the Opanowich baby. The point in issue here was the cause of the death of the Opanowich child, not what caused the death of other babies under undisclosed circumstances. As has been stated, Dr. Werne admitted he did not know the cause of the infection in question. Evidence of a known disease from an unknown cause observed in the bodies of other babies who may have died under varying and different circumstances could only create confusion and prove nothing material to the issue presented here, and was properly disallowed.

Cases involving this question are rare, and we have been cited to none directly in point. The situation differs from that of evidence in the nature of charts and diagrams, such

as were allowed to be exhibited here, which tend to clarify particular issues by demonstrative evidence. It is true that a physician may testify concerning his experiences with diseases or injuries, and express his opinion, when qualified, as to the cause of the condition of a person whose case is upon trial; but we think that to allow to be introduced exhibits of another person having a like condition with that of the person whose case is on trial injects into the case matters irrelevant and foreign to the matter under inquiry.

In *Moss* v. *May Department Stores Co.*, (Mo. App.) 31 S. W. (2d) 566, an action for injuries, there was introduced into evidence a person who had the same disease as that of the plaintiff. The appellate court held that a defendant, in such an action, cannot produce another person as an exhibit of like condition with plaintiff, and show that the former's condition is a result of some other cause.

In *Grand Lodge, Brotherhood of Railroad Trainmen* v. *Randolph*, 186 Ill. 89, 57 N. E. 882, the defendant sought to have the injured ankle of a witness exhibited to a jury for the purpose of showing a similar injury to that of plaintiff, and that it had so far healed that he was still able to perform his duties in train service. There the court, holding such evidence inadmissible, said:

"But it is obvious that the point at issue was the extent of the plaintiff's and not the witness' injuries, and that to have permitted the close scrutiny requested, into the nature and extent of the injury to the witness' ankle, would have raised a collateral issue, and diverted the minds of the jury from the issues submitted to them."

It was for the jury to determine the weight to be given the testimony of the expert witnesses, whose opinions differed. It was for them to decide, considering the ability and character of the witnesses, their actions upon the witness stand, the weight and process of the reasoning by which they supported their opinion, their possible bias in favor of the side for which they testified, their relative opportunities for study or observation of the matters about

which they testified, and any other matters which serve to illuminate their statements. 20 Am. Jur., Evidence § 1206, page 1056, and § 1208, page 1059; 32 C. J. S., Evidence, § 567, page 378, *et seq.*

■ We have frequently had occasion to determine what constitutes the *corpus delicti* in a prosecution for the commission of a homicide. In such cases the Commonwealth must show that there has been a death, and that the death resulted from the criminal agency of another.

In *Bowie* v. *Commonwealth*, 184 Va. 381, 390, 35 S. E. (2d) 345, after reviewing the cases and the authorities, we said:

"Death must be proved either by direct testimony or by presumptive evidence of the strongest kind; but the existence of the criminal agency as the cause of the death and the identity of the agency may be established by circumstantial evidence.

"An examination of the body of a dead person will not always disclose whether death was from natural causes or by means of violence. An investigation of the cause of death is, therefore, not limited to the mere appearance of the body. The circumstances surrounding the cause of death may be inquired into. They may or may not show that death was due to a criminal agency. They may or may not furnish a clue to the identity of the criminal agent. However, if death is shown to have resulted through a criminal agency, the *corpus delicti* is established. The identity of the guilty agent is an additional question for consideration."

In *Terry* v. *Commonwealth*, 171 Va. 505, 508, 198 S. E. 911, Mr. Justice Hudgins, now Chief Justice, said:

"In every prosecution for the commission of a homicide, the *corpus delicti* has two components; death as the result, and the criminal agency of another as the means."

To the same effect see *Smith* v. *Commonwealth*, 21 Gratt. (62 Va.) 809; *Dean* v. *Commonwealth*, 32 Gratt. (73 Va.)

912; and *Nicholas* v. *Commonwealth*, 91 Va. 741, 21 S. E. 364.

"Direct evidence is not essential to prove the *corpus delicti* in any case. It may be proved as any other fact may be proved which is essential to establish the guilt of the accused, namely, by circumstantial evidence which produces the full assurance of moral certainty on the subject. *Nicholas* v. *Commonwealth*, 91 Va. 741, 750, 21 S. E. 364, 367; *Cochran* v. *Commonwealth*, 122 Va. 801, 94 S. E. 329; *Harrison* v. *Commonwealth*, 183 Va. 394, 32 S. E. (2d) 136.

In this case the evidence of the Commonwealth showed that the baby did not die from natural causes. The symptoms disclosed by the autopsy and the findings of Dr. Dolan support the charge that its death was due to the deprivation of oxygen in its lungs, and that such deprivation was caused by extraneous means. Therefore, the identity of the infant and its death as a result of a criminal agency were shown.

It is not always possible to have direct evidence of the commission of a crime. In the administration of justice, circumstantial evidence has been made legal and competent, and if it is of such a character as to exclude every reasonable hypothesis, other than the guilt of an accused, it is entitled to the same weight as direct testimony. *Longley's Case*, 99 Va. 807, 811, 37 S. E. 339. Here the coincidences and circumstances tending to show guilt of Mrs. Opanowich are so strong as to admit of no reasoanble conclusion save that of her guilt. While circumstantial evidence must always be scanned with great caution, it is sufficient where all of the circumstances of time, place, motive, opportunity and conduct concur in pointing out an accused as the perpetrator of the crime, and produce a moral, if not absolute, certainty of guilt. *Dean* v. *Commonwealth, supra*, page 926; *Orange* v. *Commonwealth*, 191 Va. 423, 435, 61 S. E. (2d) 267.

Here the evidence of the Commonwealth was that the baby was alive during the forepart of February 11th; that its existence was a burden to the defendant; that the

defendant declared her intent to get rid of it; that while it was alive, she planned to dispose of its body; that the child did not die from natural causes; that the defendant was the only one who had contact with the child; that she had ample opportunity to carry out her plan to get rid of it; and that she made false and contradictory statements about the condition of the child and the disposition of its body. Her statements to her paramour and to the police, her declared motive, her misleading, confusing and evasive answers and explanations, and the secretive and unnatural manner in which she disposed of the body of the child all join in pointing to her guilt.

She does not explain her statements, her attitude or actions before or after the death of the infant in any manner consistent with her declaration of affection for it. It is demanding too much to ask one to believe that a devoted and innocent mother could have conducted herself as did the defendant.

The jury was fully and fairly informed on all phases of the case, including several instructions relating to the question of the mental responsibility of defendant at the time of the alleged offense. Error is assigned only to the granting of instruction No. 1 on the ground that the Commonwealth failed to prove any of the elements of murder or manslaughter. The instruction, in the usual language, informed the jury as to the essential elements of such offenses. It is admitted that it is not an improper instruction where it has been proven that a homicide has been committed. In view of our conclusion above stated, no further consideration need be given this assignment of error.

The defendant has been tried by a fair and impartial jury. An able and experienced trial judge observed the witnesses on the stand, heard their testimony, and has affirmed the verdict of the jury. Viewing the evidence as a whole, we are of opinion that it is sufficient to sustain her conviction.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*

WHITTLE, J., dissenting.

I have no difficulty in following the majority on all points save one, which is fatal to the case, *i. e.*, the lack of evidence tending to prove an essential element of the *corpus delicti*, "that the deceased met death by criminal violence". In my view there is a complete lack of such proof. When no criminal *violence* has been shown, no amount of suspicion pointing to a possible criminal *agent* will suffice.

The record shows that the Commonwealth skips over this essential legal requirement and immediately seizes upon the unsavory character of the accused and the circumstances surrounding the discovery of the body. The case was tried on the theory that if you give a dog a name sufficiently bad you may destroy it with impunity. It is undeniable that the bad name was fully and nauseously established, and the jury, believing this all-sufficient, speculated that death resulted from criminal violence when no proof of such fact appears in the record.

This infant "conceived and born in sin" came into the world without professional aid, the mother being alone when the child was born; there was neither a record of the child's birth nor a record of its death; she feared publicity. There was evidence to the effect that the accused had threatened to do away with the baby, and there was also evidence that she falsely stated to the police officers that she had disposed of the remains after the baby died by placing the body in the furnace.

Admittedly, the circumstances surrounding the birth of the baby and the disposition of the body after death were unnatural. However, the accused was not being tried for her unnatural actions, she was indicted and tried for the

murder of her baby. The medical evidence for the Commonwealth confirms the fact that the infant was suffering from a throat irritation not caused by violence but by a germ infection, and that there were no visible signs of criminal violence. The Commonwealth attempted to establish a criminal cause of death by calling for an autopsic examination the result of which was negative. If it were not necessary under the law to establish criminality then why the necessity for this extreme measure?

Unfortunately, many infants die of asphyxiation or suffocation without the intervention of a criminal agency. All that has been here shown is that death was due to "asphyxia, *probably* due to smothering, suffocation". "Probably" denotes conjecture and speculation—not proof. Such evidence does not establish "criminal violence" beyond a reasonable doubt.

For this reason I feel that the judgment should be reversed and the case remanded for further proceedings if the Commonwealth be so advised.