**Salem**

LEONARD WESLEY SNEAD

v.

COMMONWEALTH OF VIRGINIA

No. 0236-86

Decided August 4, 1987

---

494

COUNSEL

B. James Jefferson (Welch and Jefferson, on brief), for appellant.

Robert Q. Harris, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KOONTZ, C.J.** — Leonard Wesley Snead was convicted in a bench trial of unlawfully and feloniously operating a gambling enterprise in violation of Code § 18.2-328. On appeal, Snead argues that: (1) the trial court erred in admitting into evidence a taped telephone conversation from a person who identified himself as "Leonard Snead;" and (2) the evidence was insufficient to sustain a conviction of operating an illegal gambling enterprise. For the reasons stated below, we conclude that the trial court erred and reverse.

The essential facts are not in dispute. On February 7, 1985, the Virginia State Police, assisted by the Franklin County Sheriff's

Department, conducted a search of a house in Franklin County suspected to house a gambling enterprise. Snead was not at the house during the search. A telephone located in a bedroom had a call forwarding mechanism which had been activated. A telephone number, 483-5936, was written on a piece of paper next to the telephone with call forwarding instructions. Investigator Ewell Hunt of the Franklin County Sheriff's Department deactivated the call forwarding mechanism. Special Agent Mike Peters of the Virginia State Police began answering this telephone. The first call was not recorded. The caller asked for "Jim" or "Snead" and placed bets totaling $600. Nine subsequent calls were recorded. Some callers placed bets on sporting events or asked for the "line" on certain games. All of the callers asked for "Jim" or "Joplin" except one caller who identified himself as "Leonard Snead" but he made no mention of placing a bet or of gambling in general. After a brief conversation, Peters advised the caller that he was a police officer and the caller hung up. No witness ever identified the voice as being that of Leonard Snead. At trial, the taped conversation was admitted over Snead's objection.

Bobby Pinckard testified that he was familiar with the house that was searched and that he had frequented it between December 26, 1984 and February 4, 1985. He testified that "if [he] remember[ed] correctly," Snead sometimes answered the phone and placed pieces of paper in his pocket. He remembered people asking Snead for the "line," but he did not remember Snead ever giving the "line."

Ray Stirling, an FBI agent, qualified as an expert in gambling operations, testified that ten sheets of paper found in the house were records of a gambling operation. He estimated that bets totaling more than $30,000 were placed between December 26, 1984 and January 1, 1985. He also testified that there was no scientific evidence such as fingerprints or handwriting exemplars to link Snead to these gambling records.

According to a deed seized during the search, the house was jointly purchased in 1978 by Snead, his wife, James Joplin, a co-defendant, and Joplin's wife. The telephone number at the house was 483-2996 and was subscribed to by a Freddie Lynch. The telephone number found next to the telephone with the call forwarding instructions was 483-5936 and was subscribed to by James Joplin. Utility bills dating from 1979 and 1980 and ad-

dressed to Snead were also seized.

◼ Snead first contends that the taped telephone conversation between a person who identified himself as "Leonard Snead" and Special Agent Peters should not have been admitted because no one identified the caller's voice as that of Snead. It is well settled in Virginia that "conversations overheard on a telephone are admissible as substantive evidence when the identity of the parties to the conversation is established, either by direct evidence or by facts and circumstances." *Opanowich v. Commonwealth*, 196 Va. 342, 351, 83 S.E.2d 432, 438 (1954)(citations omitted); *accord Benson v. Commonwealth*, 190 Va. 744, 751, 58 S.E.2d 312, 315 (1950). Although it is possible to establish a party's identity by circumstantial evidence, "[a] statement of his identity by the party called [or calling], standing alone, is not generally regarded as sufficient proof of such identity unless it is corroborated by other circumstances." *Benson*, 190 Va. at 751, 58 S.E.2d at 315 (citations omitted). We agree with Snead that the circumstantial evidence in this case was not sufficient to establish his identity as the caller.

◼ The Commonwealth argues that our recent decision in *Armes v. Commonwealth*, 3 Va. App. 189, 349 S.E.2d 150 (1986), is controlling. There, we set forth the following standard:

> Communications by telephone are admissible in evidence where they are relevant to the fact or facts in issue, and admissibility is governed by the same rules of evidence concerning face-to-face conversations except the party against whom the conversations are sought to be used must ordinarily be identified. It is not necessary that the witness be able, at the time of the conversation, to identify the person with whom the conversation was had, provided . . . identification is proved by direct or circumstantial evidence somewhere in the development of the case. The mere statement of his identity by the party calling is not in itself sufficient proof of such identity, in the absence of corroborating circumstances so as to render the conversation admissible.

*Id.* at 193, 349 S.E.2d at 152 (citations omitted).

We find the facts in *Armes* distinguishable, however, from the case at bar. Armes was charged and convicted of soliciting an-

other person to commit murder. A witness, Michael Coffey, testified that he received several telephone calls from a woman identifying herself as "Linda," who wanted him to kill "Jack's" wife for $10,000. "Linda" knew many things that were known only to Armes and her lover, Dr. Robert Stickle ("Jack"). First, Coffey was the brother of Armes' son-in-law and both Armes and "Linda" knew Coffey needed money. "Linda" knew Coffey's home and office telephone numbers. Armes and "Linda" both knew that "Jack" wanted someone to kill his wife and he was willing to pay $10,000. Armes gave Coffey's telephone number to Stickle and told him to identify himself as "a friend of Linda's." *Id.* at 191-94, 349 S.E.2d at 152-53.

At the outset of our analysis we note that "[t]he mere statement of his identity by the party calling is not in itself sufficient proof of such identity, in the absence of corroborating circumstances so as to render the conversation admissible." *Id.* at 193, 349 S.E.2d at 152 (citations omitted). Thus, the telephone conversation in which the caller identified himself as "Leonard Snead" was inadmissible absent corroborating circumstantial evidence. The type of corroborating circumstantial evidence present in *Armes* is absent here. The corroborating facts offered by the Commonwealth are simply too tenuous to establish the circumstantial evidence necessary to establish the identity of the caller. Although the deed to the house revealed that Snead was a co-owner in 1978, there was no evidence that he lived there on February 5, 1985. The utility bills which were addressed to him and found in the house were five and six years old and thus, too remote to be of significant corroborative value. Further, the telephone subscriber at the house at the time of the search was a Freddie Lynch, not Snead. The telephone number found next to the phone with the call forwarding mechanism belonged to James Joplin. Furthermore, even if the deed or the utility bills are taken as circumstantial evidence that Snead lived at the house, those facts do not tend to prove that Snead was, in fact, the caller.

Although Bobby Pinckard testified that he had seen Snead at the house answering the phone and placing pieces of paper in his pocket on previous occasions, he could not specifically say Snead participated in any gambling activities. Moreover, the expert witness who identified indicia of a gambling enterprise at the house found no physical evidence or handwriting exemplars which linked

Snead to the gambling enterprise.

The Commonwealth argues that it is significant that the caller who identified himself as "Leonard Snead" intended to reach 483-2996. We find this argument unpersuasive. Special Agent Peters recorded nine telephone calls. It is clear from a reading of the transcript that seven of these callers intended to reach 483-2996. Likewise, the Commonwealth's argument that Snead's identity is corroborated by the fact that the caller insisted on knowing the name of the person to whom he was speaking is unpersuasive. We assume that it is not unusual for participants in a clandestine and illegal gambling enterprise to insist on speaking to a person with whom they are familiar. In fact, two of the callers on the tape requested to speak to "Jim" and would not place bets with an unfamiliar voice. This does not convince us that either of those callers was Snead. We also note that no mention was made of gambling or of placing a bet during the phone call in question.

For these reasons, we find insufficient evidence to corroborate "the mere statement of . . . identity" by the caller who identified himself as "Leonard Snead." Standing alone, the "mere statement of . . . identity" was insufficient to meet the "threshold of admissibility." *Armes*, 3 Va. App. at 193, 349 S.E.2d at 152 (citations omitted). Accordingly, we hold that the trial court erred in admitting the transcript of this taped telephone conversation.

Snead also argues that the evidence was insufficient to show that he was operating a gambling enterprise. We agree. When the evidence is examined without the transcript of the taped telephone conversation, there is insufficient evidence to connect Snead to the gambling enterprise. No physical evidence was identified by the expert witness linking Snead to the illegal activity in the house. The telephone number found next to the telephone at the house was the telephone number of James Joplin. The telephone at the house at the time of the search was subscribed to by Freddie Lynch. The utility bills addressed to Snead were five and six years old. Bobby Pinckard frequented this house and had never seen or heard Snead give the "line," although he had seen him answer the phone and place pieces of paper in his pockets. While this evidence is suspicious, we believe that there is such a wide range of inferences that flow from Snead answering the phone in December 1984 and January 1985 that we do not find that this evidence rises to the level of guilt beyond a reasonable doubt.

■ In a case such as this where the evidence relied upon is circumstantial, our position is clear:

"[I]f the proof relied upon by the Commonwealth is wholly circumstantial . . . then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt."

*Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)(quoting *LaPrade v. Commonwealth*, 191 Va. 410, 418, 61 S.E.2d 313, 316 (1950)). In this case, clearly, all of the circumstances are not inconsistent with innocence. Absent the taped telephone conversation which was improperly admitted, there is insufficient evidence on which to sustain a conviction. Accordingly, the judgment appealed from is reversed and dismissed.

*Reversed and dismissed.*

Benton, J., and Coleman, J., concurred.